[No. A016661. First Dist., Div. Four. July 16, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
GENE MICHAEL KELLEY et al., Defendants and Appellants.

COUNSEL

Mark W. Plank, under appointment by the Court of Appeal, Shapiro & Shapiro, J. Tony Serra and Diana Samuelson for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Edward P. O'Brien, Assistant Attorney General, and Robert R. Granucci, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**POCHÉ, Acting P. J.**—Defendants Gene Michael Kelley and Kenneth Vincent Nicholas were jointly tried and convicted of two counts of sale of cocaine (Health & Saf. Code, § 11352); defendant Kelley was charged and convicted of two additional counts (*ibid.*). Each appeals contending, inter alia, that the entrapment instructions are confusing and are inconsistent with a purely objective standard of entrapment. We find the instructions to be consistent with the entrapment standard set forth by the California Supreme Court in *People* v. *Barraza* (1979) 23 Cal.3d 675 [153 Cal.Rptr. 459, 591 P.2d 947].

### Facts

Gregory Ryan, an officer with the United States Park Police, began working on March 1, 1981[1] as an undercover agent in the narcotics division of the Marin County major crimes task force. He was assigned to work with an informant, Dodie Leahy. Leahy had previously contacted Sergeant Keaton of the major crimes task force and had given Keaton the names of several individuals involved in drug trafficking. Keaton advised her to introduce Ryan to those individuals and that she was to use a cover story that Ryan was an old boyfriend from the east coast who had come to California for a vacation and that while here he was interested in buying some drugs to take back east to sell.

In accordance with those instructions, Leahy went to the Velvet Turtle Restaurant and spoke to the defendant Michael Kelley. She told Kelley that Ryan was from the east coast and was interested in buying some "coke." Kelley replied that Ryan should give him a call at his mother's house, and he gave Leahy the phone number.

On May 19, Leahy went to Marin General Hospital in connection with her son's tonsillectomy. Pursuant to an earlier telephone call, Kelley joined her at the hospital. From there, Leahy placed a call to Ryan, advised Ryan that Kelley wanted to talk to him, and handed Kelley the telephone. Kelley and Ryan then had a conversation.

---

[1] Unless otherwise indicated, all dates refer to the 1981 calendar year.

On May 20, Ryan telephoned Kelley at the Velvet Turtle and discussed a cocaine buy, including the price. Ryan telephoned Kelley again, and at that time they discussed the sale of cocaine to take place later that day. Both conversations were tape-recorded as were almost all telephone and in-person conversations between Ryan and Kelley. Pursuant to a discussion on the telephone, Ryan, accompanied by surveillance officers, went to the Red Hill Shopping Center in San Anselmo at about 5 p.m. As Ryan sat on his car in the parking lot Kelley came up and introduced himself. Ryan and Kelley then negotiated for an eighth of an ounce of cocaine for $280. During their conversation, two girls, LuAnn Eaton and Kelly Lofquis, drove up. While Kelley briefly left to get something to eat Ryan spoke with LuAnn, who also wanted to buy an eighth of an ounce of cocaine. Then a man named Chris arrived. Kelley returned and asked Ryan for the $280 so that he could go pick up the cocaine. Ryan did not want to front the money because he feared losing it; so Ryan did not make a buy that day.

The next day, May 21, at about 1:45 p.m., Ryan telephoned Kelley and ordered another eighth of an ounce of cocaine. Ryan called back approximately 20 minutes later and negotiated a price of $280. Kelley then telephoned Ryan and discussed the cocaine transaction. During this conversation they referred to a Tom Lennon as another drug dealer who had sold cocaine to Ryan. Kelley telephoned Ryan again and they discussed the particular arrangements for the buy that day.

Pursuant to that discussion Ryan went to Kelley's apartment on 6th Street in Novato at about 6 p.m. Kelley's girlfriend, Kelly Lofquis, answered the door and they proceeded to a back bedroom. As Ryan entered, Kelley was talking on the phone and said " 'He's here right now,' " and then hung up. Kelley told Ryan that he was having trouble with his "connection" in getting the cocaine. Kelley then made another call, said " 'Chris, he's here,' " and asked the person to bring over his "beam scale" (a measurement scale). Fifteen minutes later, a man identifying himself as Chris arrived at the back bedroom; Ryan talked with him about the eighth of an ounce of cocaine he wanted to buy. Chris said he had a sample, reached into his pocket, took out a bindle and handed it to Kelley. Kelley opened up the bindle, looked at it, refolded the bindle and handed it to Ryan. Kelley said he wanted $20 "for this" and Ryan handed him the money. Kelley pocketed the money. The bindle contained .2 grams of a powder containing cocaine.

Kelley telephoned Ryan again on May 26, said he could get an eighth of an ounce of cocaine and that he would phone Ryan the next day. Kelley phoned Ryan three times the next day to arrange the cocaine buy. Pursuant to Kelley's instructions, Ryan went to a public telephone booth in the Ignacio Shopping Center and telephoned Kelley. Kelley said he would meet

Ryan there and shortly thereafter arrived in a green Ford van. He told Ryan to follow him to Harbor Drive in Black Point. Kelley pulled into "Betsy's" general store and told Ryan to wait there. Kelley returned within 10 minutes, got into Ryan's vehicle and gave him a plastic baggie of cocaine. Kelley put the $280 Ryan handed him in his pocket and said he wanted to "tap the bag," that is, take out a small portion of the cocaine. Ryan said that he was going to resell it and that he could not take anything out of the bag. The bag contained 3.4 grams of a powder containing cocaine.

Ryan told Kelley that he was still interested in purchasing some cocaine from Chris. Kelley said that Chris was "flaking out" and that he wanted Ryan to deal through "this particular connection" that Kelley was dealing with that day. Kelley told Ryan that his connection's cocaine "was as good, if not better." Kelley got in his van; Ryan left the area.

Kelley telephoned Ryan twice on May 28, for the purpose of arranging a cocaine purchase of a quarter of an ounce of cocaine for $575 to take place on June 1. Pursuant to the arrangements, at about 1 p.m., Ryan drove to Betsy's general store where he met Kelley who was accompanied by Felicia Parfit. Kelley again attempted to get Ryan to front the money for the cocaine but when Ryan refused Kelley agreed to go pick it up. Kelley drove to 146 Atherton Avenue in Novato, the residence of defendant Kenneth Nicholas, and then returned to the parking area near Betsy's general store. Nicholas was in the passenger seat. Kelley parked next to Ryan and handed him a plastic bag of cocaine. Ryan counted out $600 and handed it to Kelley.[2] The bag contained 7.14 grams of a powder containing cocaine. Ryan then talked to Nicholas about an additional cocaine sale for later in the week. Nicholas indicated that he was going to get a shipment of "good flake" (cocaine) later in the week. Ryan said that he was expecting to get some "big bucks" from the east coast and that he was interested in purchasing a large amount of cocaine, anywhere from a quarter to a half of a pound. Nicholas told Ryan to get in touch with Kelley who would then contact Nicholas and they would consummate the deal later on in the week.

Ryan and Kelley had a series of seven telephone calls between June 3 and June 5 for the purposes of arranging the purchase of cocaine on June 5. Various quantities and prices were discussed; Kelley indicated that the cocaine would be 85-90 percent pure. During the last telephone call the arrangements were finalized for Ryan to purchase half a pound of cocaine for $15,200.

---

[2] Kelley had earlier asked for a reward for arranging that deal. Ryan therefore gave him an additional $25 as a reward.

At 11:15 a.m. on June 5, Ryan drove to a telephone booth by a Seven Eleven store and met Kelley who had driven from Nicholas' residence with Felicia Parfit and Kelly Lofquis. Kelley called his "connection," advised that Ryan was present and asked his connection to come down and count the money. After the call ended Kelley told Ryan that he had been instructed to count the money. Ryan then went to the trunk of his car, took out a box of money, returned to the driver's seat and with Kelley in the passenger seat counted the money. Kelley then telephoned his connection and told him that the money was there. Kelley then told Ryan to wait by the phone and that he was going to the connection's house and that he would call him when everything was "together" to arrange a place for the "deal [to] go down."

Kelley later called Ryan and said that the deal would go down in the parking area of Betsy's general store, and that it would take place in stages with three ounces to start with. Ryan, accompanied by surveillance officers, proceeded to Betsy's. At the same time, Kelley and Nicholas left Nicholas' residence and proceeded in separate cars to Betsy's. Kelley arrived accompanied by Felicia Parfit, got into Ryan's car and handed Ryan three ounces of cocaine. Ryan noticed Nicholas as he parked his vehicle directly across the street and then walked over to the front of the store. After examining the cocaine, Ryan gave the arrest signal to the surveillance officers. The men were then arrested.

The defense focused on Leahy, not Ryan, as the entrapping agent. Leahy testified that she had contacted Keaton because she "wanted to see if anything could be done to try to help slow down the drug traffic in Marin County . . . when my sister was 15 years old she was heavily involved with drugs, and I just saw a lot of people going downhill more and more." She began to do undercover work and some of the people she investigated, including Kelley, were her friends. She admitted, however, that she had never seen Kelley sell drugs.

Leahy testified that Keaton advised her of what to "stay away from in terms of entrapment": "He handed me a sheet on entrapment and I read it. You had to sign it." Although she could not remember what the sheet said, she thought entrapment was: ". . . It's just I was not supposed to handle any drugs or anything like that. Don't do anything." She also stated that entrapment was "[n]ot forcing somebody into doing something that he normally wouldn't do." She understood that she should not appeal to a person to commit an act because of friendship and sympathy and said that she did not do that with Kelley: "I did not twist his arm, sir." At one point however, she was asked: "The fact is, Ms. Leahy, to get Michael Kelley to do what he did you had to appeal to his friendship and sympathy, is that correct?" She responded: "Yes, sir, I guess so."

The defense centered on Leahy's testimony at the preliminary hearing to the effect that she told Kelley that she felt physically threatened by an old boyfriend, David Trice, and that if the drug transaction took place she could move to the east coast and have a better life with her son. At trial, however, Leahy denied making these statements to Kelley. Nancy Velarde, Kelley's sister, testified that she heard Leahy tell her brother that story. Kelley's wife testified that on the night before the arrest, Leahy drove Kelley to the hospital because he had hurt his leg, and that during this trip, Leahy said that she still wanted to get away from Trice and that "this was his [Kelley's] way of paying her back" for things she had done for his sister and that with the money she could then go back east with Ryan. Leahy denied making any of these statements.

The witnesses agreed, however, that Kelley was quite fond of Leahy's son, Brian, and that they had a good relationship.

*Review*

I.

In *People* v. *Barraza, supra,* 23 Cal.3d 675, the California Supreme Court set forth the guiding principles of entrapment in this state: ■ ". . . [T]he proper test of entrapment in California is the following: was the conduct of the law enforcement agent likely to induce a normally law-abiding person to commit the offense? For the purposes of this test, we presume that such a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime. [¶] ■ Although the determination of what police conduct is impermissible must to some extent proceed on an ad hoc basis, guidance will generally be found in the application of one or both of two principles. First, if the actions of the law enforcement agent would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent, entrapment will be established. An example of such conduct would be an appeal by the police that would induce such a person to commit the act because of friendship or sympathy, instead of a desire for personal gain or other typical criminal purpose. Second, affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person will likewise constitute entrapment. Such conduct would include, for example, a guarantee that the act is not illegal or the offense will go unde-

tected, an offer of exorbitant consideration, or any similar enticement. [¶] ▇ Finally, while the inquiry must focus primarily on the conduct of the law enforcement agent, that conduct is not viewed in a vacuum; it should also be judged by the effect it would have on a normally law-abiding person situated in the circumstances of the case at hand. Among the circumstances that may be relevant for this purpose, for example, are the transactions preceding the offense, the suspect's response to the inducements of the officer, the gravity of the crime, and the difficulty of detecting instances of its commission. [Citation.] We reiterate, however, that under this test such matters as the character of the suspect, his predisposition to commit the offense, and his subjective intent are irrelevant." [*Id.,* at pp. 689-691 [fns. omitted]; accord, *People* v. *Peppars* (1983) 140 Cal.App.3d 677, 684-685 [189 Cal.Rptr. 879].)

▇▇ Defendants urge that the language of *Barraza* and the CALJIC instructions based thereon are unclear and confusing expressions of the defense of entrapment and should be revised. This court has no power to revise the standard of entrapment the California Supreme Court set forth in *Barraza* (see *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369, P.2d 937]) but is empowered to review the CALJIC instructions to determine whether they constitute a clear and accurate recitation of the defense of entrapment as set forth in *Barraza.* They do.

The *Barraza* principles are incorporated in the standard jury instructions on entrapment. (See CALJIC No. 4.60 (1979 rev.) [when entrapment is a defense]; CALJIC No. 4.61 (1981 rev.) [entrapment—objective test—guidance]; CALJIC No. 4.61.5 (1979 rev.) [entrapment—permissible and impermissible conduct].) Modified versions of these instructions were given to the jury as set forth in the margin.[3]

---

[3]"It is the defense to the commission of an act, otherwise criminal, that such act was induced by the conduct of the law enforcements agents or officers or persons acting under their direction, suggestion or control—and it is conceded in this case that Ms. Leahy was such a person—when the conduct was such as would likely induce a normally law abiding person to commit the crime. [¶] To establish this defense the defendants have the burden of proving by a preponderance of the evidence that the conduct of the law enforcement agents or officers induced him to commit the crime and that the conduct was such as would likely induce a normally law abiding person to commit such crime. [¶] Preponderance of the evidence means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth. [¶] If you find by a preponderance of the evidence that this defense has been established, the defendants are entitled to a verdict of not guilty." (Cf. CALJIC No. 4.60 (1979 3d rev.).)

"A defendant need not admit his guilt or even the commission of the act to raise the defense of entrapment. [¶] In determining whether this defense has been established, guidance will generally be found in the application of one or both of two principles. [¶] First, if the actions of the law enforcement agent would generate in a normally law abiding person a motive for the crime other than ordinary criminal intent, entrapment will be established.

Defendants urge that the use of the term "normally law-abiding person" creates a "fatal flaw" in CALJIC No. 4.61. (See fn. 3.) In their view, use of that term focuses the jurors' attention on the character, predisposition and subjective intent of the actor and away from the conduct of the police. The short answer is: the challenged term comes straight from *Barraza.*

The instruction makes clear that the test of entrapment is an objective not subjective one: "Such matters as the character of the defendant, his predisposition to commit the offense, and his subjective intent are not relevant to the determination of the question of whether entrapment occurred." (See also *People* v. *Barraza, supra,* 23 Cal.3d at pp. 690-691.)

Defendants also urge that the jurors should have been instructed that a law-abiding person is any person who does not generate or originate the intent to commit the crime. In other words, they seek to redefine the defense to depend upon whether the defendant harbored an existing criminal intent prior to his interaction with the governmental authorities. Such a test, however, runs counter to the Supreme Court's explicit determination that the sequence is not relevant: "We are not concerned with who first conceived or who willingly, or reluctantly, acquiesced in a criminal project." (*People* v. *Barraza, supra,* 23 Cal.3d at p. 688.)

---

[¶] An example of such conduct would be an appeal by the police that would induce such a person to commit the act because of friendship or sympathy, instead of a desire for personal gain or other typical criminal purpose. [¶] Second, affirmative police conduct that would make commission of the crime unusually attractive to a normally law abiding person will likewise constitute entrapment. [¶] Such conduct would include, for example, a guarantee that the act is not illegal or the offense will go undetected, an offer or exorbitant consideration, or any similar enticement. [¶] Finally, while the inquiry must focus primarily on the conduct of the law enforcement agent, that conduct is not to be viewed in a vacuum; it should also be judged by the effect it would have on a normally law abiding person situated in the circumstances of the case at hand. [¶] Among the circumstances that may be relevant for this purpose, for example, are the transactions preceding the offense, the suspect's response to the inducements of the officer, the gravity of the crime, and the difficulty of detecting instances of its commission. [¶] Such matters as the character of the defendant, his predisposition to commit the offense, and his subjective intent are not relevant to the determination of the question of whether entrapment occurred." (Cf. CALJIC No. 4.61 (1981 rev.).)

"It is permissible for law enforcement agents or officers or persons acting under their direction or control to provide opportunity for the commission of a crime including reasonable, though restrained, steps to gain the confidence of suspects, but it is not permissible for law enforcement agents or officers or persons acting under their direction, suggestion or control to induce the commission of a crime by overbearing conduct such as badgering, coaxing or cajoling, importuning, or other affirmative acts likely to induce a normally law abiding person to commit the crime." (Cf. CALJIC No. 4.61.5 (1979 rev.).)

"As I mentioned, the defendant has the burden of proving by a preponderance of the evidence that he was entrapped into the commission of the crime. Preponderance of the evidence means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth. [¶] Under the evidence in this case, if you find that the defense of entrapment is established by a preponderance of the evidence, both defendants are entitled to the benefit of this finding and each should therefore be acquitted." (Cf. CALJIC No. 4.60 (1979 3d rev.).)

Defendants also object to the instruction insofar as it advises the jury not to view the conduct of the law enforcement officer in what they characterize as a " 'vacuum' ": "it should also be judged by the effect it would have on a normally law-abiding person situated in the circumstances of the case at hand. Among the circumstances that may be relevant for this purpose, for example, are the transactions preceding the offense, the suspect's response to the inducements of the officer, the gravity of the crime, and the difficulty of detecting instances of its commission." (CALJIC No. 4.61.) In defendants' view, this language improperly changes the focus of the defense from the conduct of the law enforcement agent to the conduct of the defendant.

That the focus is correctly located is demonstrated by the fact that the language in the instruction is drawn directly from *Barraza*. (*Id.*, 23 Cal.3d at p. 690.) To the extent that this language is not consistent with an objective test of entrapment, defendants' remedy is to seek review in the higher court. No other court has the power to change the high court's definition of entrapment. (*Auto Equity Sales, Inc.* v. *Superior Court, supra,* 57 Cal.2d at p. 455.)

## II.

Nicholas makes numerous assignments of error leading to the claim that he was denied a fair trial. As we have explained in Part I, his challenge to the jury instructions is without merit. The remaining assignments will be reviewed separately.

*Conduct by the prosecutor*

■ Nicholas contends that the prosecutor took advantage "to the fullest extent the difficulties with the *Barraza* test to shift the focus of the inquiry from the informer Leahy's conduct to an examination of how [defendants'] conduct compared to that of a normally law abiding person. . . ."

The prosecutor repeatedly hammered home that even if the jury accepted the defense version of events, a "normally law abiding person" would not have engaged in the drug sales. An example of the argument follows: "By definition, Ladies and Gentlemen of the jury, the normally law abiding person is what? A person who doesn't commit crimes. [¶] I submit to you, even if you concede the argument—which we are not—that given those factors, a normally law abiding citizen would not sell $20 worth of cocaine, and the next time sell $280 worth of cocaine, and the third time . . . ." As the trial court correctly noted, since this argument was based upon the language of *Barraza,* it was perfectly proper advocacy.

*Conduct by the trial court*

██ Nicholas also urges that the trial court heightened the confusion engendered by the CALJIC instructions by making various comments during trial.

For instance, when Leahy responded to the prosecutor's question that she thought she understood what entrapment meant, the trial court interjected, *"You may be the only one in the courtroom that does."* (Italics added.) During deliberations, the jury asked for further instruction on entrapment, and the court commented, *"I am surprised that we have a question. (Laughter.) I understand . . . you want a definition of a subjective intent. . . .*

". . . . . . . . . . . . . . . . . . . . . . .

*"[A]gain, as I'm sure you appreciate, this area of the law is not as clear as it might be."* (Italics added.) The trial court then answered the question: "We have had considerable discussion over it, but as I interpret the law, what they're trying to say there, what is going on in a particular defendant's mind at the time, his subjective state of mind, is not relevant. [¶] The issue is whether the particular defendant, in fact, responded to whatever appeals you find were or were not made. [¶] The issue is, as I said several times, is to focus on the conduct of the police and ask yourselves what effect or what impact that conduct would have on a hypothetical normally law abiding person. That's the best I can do, really. [¶] Does that clear it up for you?"

Nicholas urges that the equivocal language of the instructions when considered in the context of the trial court's statements, mandates reversal. He relies on *People* v. *Dail* (1943) 22 Cal.2d 642 [140 P.2d 828], disapproved on another ground in *People* v. *Cook* (1983) 33 Cal.3d 400 [189 Cal.Rptr. 159, 658 P.2d 86].

In *Dail,* the trial court gave conflicting instructions on how to weigh the credibility of an accomplice's testimony. One instruction told the jury to judge the accomplice's testimony as it would any other witness, and the second, informed the jury to view it with distrust. The trial court failed to reconcile the two rules, and as noted by the high court, the result "must inevitably have been a confusion in the jurors' minds on a matter vital to the judgment." (*Id.,* at p. 653.) That error was compounded by inappropriate comments by the trial court concerning the accomplice's testimony. (*Id.,* at pp. 657-658.)

Here, unlike the situation in *Dail,* the trial court did not give conflicting instructions on entrapment: it recited the standards as set forth in *Barraza.*

Here, the court did not convey to the jury that it believed that the law was irreconcilable nor did the court leave the jury with inconsistent instructions. There was no confusion engendered either by the instructions or by the court's appropriate and humor-filled asides.

*Admission of the tape recordings*

■ Prior to trial, defense counsel made clear that their entrapment defense hinged on Leahy being the entrapping agent, not Ryan. During a pretrial hearing, defense counsel objected to the admission of the tapes and offered to stipulate that the crimes had been committed. The prosecution refused the stipulation, and the trial court overruled the objection to the introduction of the tapes. Accordingly, the prosecution was allowed to introduce the tape recorded conversations between Ryan and Kelley. Nicholas urges that under *People* v. *Hall* (1980) 28 Cal.3d 143 [167 Cal.Rptr. 844, 616 P.2d 826], the prosecution was required to accept the stipulation.

In *Hall*, the court held that where the defense offers to admit the existence of an element of a charged offense, the prosecutor must accept that offer and refrain from introducing evidence of that element. (*Id.*, 28 Cal.3d at p. 152.) But the court was careful to note that the rule is not without exception: "If the facts to which the defendant has offered to stipulate retain some probative value, then evidence of such facts may be introduced. For example, if evidence remains relevant to an issue not covered by the stipulation or admission, the evidence is admissible on the remaining issue. [Citations.] If the stipulation would force the prosecution to elect between theories of guilt, or would hamper a coherent presentation of the evidence on the remaining issues, evidence of the stipulated facts is admissible. [Citation.] Further, if a stipulation or admission is 'ambiguous in form or limited in scope or [if] during the trial of a case, a party seeks to deprive his opponent of the legitimate force and effect of material evidence . . .' the evidence retains some probative value and is admissible. [Citation.]" (*Id.*, at pp. 152-153.)

Here the exception applies. The obvious purpose of the offer to stipulate was to remove from the jurors' consideration the circumstances surrounding the commission of the crime. But, as *Barraza* enunciates, that is precisely what jurors are entitled to consider in determining whether the defendant had been entrapped. (*Id.*, 23 Cal.3d at p. 690.) Thus even if the offer to stipulate had been accepted, the prosecution would have been entitled to introduce the tape recordings; otherwise the prosecution would be deprived " 'of the legitimate force and effect of material evidence.' " (*People* v. *Hall*, *supra*, 28 Cal.3d at p. 153.)

## III.

The next question is whether this is the "rare case . . . [which] warrant[s] the usurpation of the fact finding process by the appellate . . . court with the conclusion that only one reasonable inference can be drawn from the evidence—that is, that the conduct of the law enforcement agent was likely to induce a normally law-abiding person to commit the offense. . . ." (*People* v. *Peppars, supra,* 140 Cal.App.3d 677, 684-685.) In urging that the inference must be drawn here Nicholas relies on two United States Supreme Court decisions, *Sorrells* v. *United States* (1932) 287 U.S. 435 [77 L.Ed. 413, 53 S.Ct. 210, 86 A.L.R. 249], and *Sherman* v. *United States* (1958) 356 U.S. 369 [2 L.Ed.2d 848, 78 S.Ct. 819].

That reliance is inappropriate since California has specifically rejected the subjective federal entrapment standard which focuses on the defendant's predisposition to commit the charged crime. (*Hampton* v. *United States* (1976) 425 U.S. 484, 489-491 [48 L.Ed.2d 113, 118-119, 96 S.Ct. 1646]; *United States* v. *Russell* (1973) 411 U.S. 423 [36 L.Ed.2d 366, 93 S.Ct. 1637]; see also *United States* v. *Wylie* (9th Cir. 1980) 625 F.2d 1371, 1377, cert. den., 449 U.S. 1080 [66 L.Ed.2d 804, 101 S.Ct. 863].) Instead, as noted, the California Supreme Court has chosen the objective test to assure the "lawfulness of law enforcement activity." (*People* v. *Barraza, supra,* 23 Cal.3d at pp. 686-691.) Thus federal cases on entrapment such as *Sorrells, supra,* 287 U.S. 435, which was the first case in which the United States Supreme Court recognized and applied the entrapment defense, and *Sherman, supra,* 356 U.S. 369, which found that as a matter of law the defendant had been entrapped are not helpful in determining whether there was entrapment under the objective California standard.

The evidence warranted the jury's implied determination that Leahy said or did nothing which "would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent," or which "would make commission of the crime unusually attractive" to that person. (See *People* v. *Barraza, supra,* 23 Cal.3d at p. 690.) The evidence also amply supports the determination that Leahy did not take any impermissible steps. In other words, Leahy did not engage in "cajoling" or "importuning"; she did not guarantee that the conduct proposed was legal or that it would "go undetected"; and she did not "offer . . . exorbitant consideration, or any similar enticement." (See *ibid.*)

Finally, the evidence also supports the jury's implied determination that Leahy's conduct was not such which would induce a normally law-abiding person to sell cocaine because of friendship or sympathy. (*People* v. *Barraza, supra,* 23 Cal.3d at p. 690.) Nicholas attempts to establish

entrapment as a matter of law by referring to portions of Leahy's preliminary examination testimony to the effect that she told Kelley she was physically threatened by her old boyfriend, and that if she made the sale to Ryan, she could then go back east and start a new life with her son. Were the evidence of this undisputed, Nicholas' point might be well taken. However, at trial, Leahy denied making these statements. Resolution of this conflict in the evidence was vigorously argued by both sides in closing argument, and the jury obviously resolved the conflict in favor of Leahy's testimony at trial.

 "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" (*People* v. *Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758], disapproved on another ground in *People* v. *Burton* (1961) 55 Cal.2d 328 [11 Cal.Rptr. 65, 359 P.2d 433]; accord *People* v. *Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267], disapproved on another ground in *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1].)

 Because it cannot be said as a matter of law that Leahy's trial testimony was apparently false, the trial court properly submitted the entrapment issue to the trier of fact. Viewing the record in the light most favorable to the verdict, the evidence amply supports the finding of the jury that Leahy's conduct under the circumstances was not likely to induce a normally law-abiding person to sell cocaine.

### IV.

 Although almost all conversations between Ryan and Kelley were monitored, none of the conversations between Leahy and Kelley was. Nicholas thus contends he was deprived of "critical exculpatory or corroborative evidence" and as a result of the "negligent or intentional failure of the State to monitor, supervise or even control their informer" he was denied a fair trial.

 The police have no obligation to collect evidence for the defense; their duty is to preserve existing material evidence on the issue of the ac-

cused's guilt or innocence. (*People* v. *Hogan* (1982) 31 Cal.3d 815, 851 [183 Cal.Rptr. 817, 647 P.2d 93].) Accordingly the police have no obligation to tape-record a confession (see *People* v. *Goss* (1980) 109 Cal.App.3d 443, 457 [167 Cal.Rptr. 224]) but once they do, a due process obligation arises to preserve that evidence. (*Ibid.*; see also *People* v. *Jones* (1983) 145 Cal.App.3d 751, 759-760 [193 Cal.Rptr. 663] [obligation to preserve rough notes of conversation with defendant].) ▮▮▮ We hold that due process does not require the police to tape record their agent's conversations with a suspect.

## V.

▮▮▮ Kelley urges that due process requires that the burden of proof be placed on the prosecution to prove the absence of entrapment beyond a reasonable doubt. The identical issue was raised and rejected by the California Supreme Court in *In re Foss* (1974) 10 Cal.3d 910, 930-932 [112 Cal.Rptr. 649, 519 P.2d 1073].

## VI.

▮▮▮ The trial court denied Nicholas' application for probation and sentenced him to state prison for the lower base term of three years. Nicholas contends this sentence was in effect a penalty for Kelley's prior unsuccessful attempts at probation and therefore was an abuse of discretion.

In determining whether to grant or deny probation, the trial court is empowered to consider, inter alia, facts relating to the crime and facts relating to the defendant. (Cal. Rules of Court, rules 414(c) and (d).) Here the trial court noted that although Nicholas had no prior record he was in a "high risk business": "When you're talking about selling half a pound of cocaine, these are not nickel and dime sales. . . ." The court also noted that Nicholas' role in the sale was "heavier" than Kelley's: "He knew the situation. He was the one that called the shots. All Mr. Kelley was doing was following his instructions." These reasons amply support the trial court's decision to deny probation.

Focusing on the trial court's comparison of the two men Nicholas argues that even if his role was greater than that of Kelley, the "[d]rastic [d]isparity" between the two men compelled different punishment. It is true, as Nicholas notes, that Kelley was convicted of four counts and Nicholas only two, and that Kelley had a prior record and Nicholas did not. Nonetheless, even though these factors might have supported a grant of probation to Nicholas, it cannot be said that the trial court abused its broad discretion in concluding that those matters were outweighed by the facts of the of-

fenses. Thus, this court has no basis on which to interfere with the trial court's determination of the appropriate sentence. (Cf. *People* v. *Vargas* (1975) 53 Cal.App.3d 516, 533 [126 Cal.Rptr. 88].)

The judgments are affirmed.

Panelli, J., and Haugner, J.,* concurred.

Petitions for a rehearing were denied August 14, 1984, and appellants' petitions for a hearing by the Supreme Court were denied October 4, 1984. Kaus, J., and Grodin, J., were of the opinion that the petitions should be granted.

---

*Assigned by the Chairperson of the Judicial Council.