[No. D009545. Fourth Dist., Div. One. Apr. 17, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
DOROTHY ANNE LEE, Defendant and Appellant.

[Opinion certified for partial publication.[1]]

---

[1] Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of section II C.

**COUNSEL**

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, and Frederick R. Millar, Jr., Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

NARES, J.—Dorothy Anne Lee (Lee) appeals from her jury-tried conviction of selling methamphetamine. (Health & Saf. Code, § 11379.) Lee admitted the offense, but defended claiming she was entrapped. Lee contends the judgment should be reversed because she established entrapment as a matter of law. Lee also contends the court erroneously (1) instructed the jury about entrapment and motive; (2) admitted evidence of an uncharged offense; and (3) excluded testimony about the content of a ship's log. We affirm. Lee did not establish entrapment as a matter of law, and the court properly instructed the jury about entrapment and properly excluded hearsay about a ship's log. Although the court erroneously admitted evidence of an uncharged offense and should not have instructed on motive, such errors are not prejudicial.

## I

### FACTS

In April 1988 Petty Officer Charles J. Ackernecht (Ackernecht) awakened in his barracks and saw Lee, a civilian, selling a "white substance" to three other sailors. After concluding the sale, Lee "brought out a mirror and razors and cut it up into lines. And then they were using dollar bills. And all of them snorted it."

Concerned because "[o]ne person can turn a valve and sink the entire ship," Ackernecht reported Lee to Naval authorities, who referred him to Naval Investigative Service (N.I.S.) agent Acevedo.

Ackernecht and Acevedo discussed the incident and he agreed to assist the N.I.S. by reporting any other drug sales he observed. Acevedo instructed Ackernecht about "safety" and "entrapment," telling him not to carry a weapon or be in a situation where he felt obligated to use drugs or ask Lee to do anything illegal.

Ackernecht saw Lee on two occasions when she was visiting in his barracks. One time Lee asked Ackernecht to drive her home. (No one other than Ackernecht owned a car.) On the way, Lee told Ackernecht she was having "money problems."

Perceiving an opportunity to "set up a buy" from Lee's comment about having "money problems," Ackernecht told Lee he "had friends who party." Lee responded "that was a way she could make some money." Lee discussed "prices and quantity"—"four quarters for $100." Ackernecht never mentioned price or quantity. He never used the words "drugs," "methamphetamine," or "crystal." According to Ackernecht, this discussion in his car was the only time he told Lee he wanted to arrange a drug sale. When Ackernecht and Lee arrived at her home, they agreed to discuss details about the contemplated sale later.

Ackernecht next saw Lee approximately one week before the sale. Lee was visiting his barracks, gave Ackernecht her telephone number, and told him to call her. When Ackernecht called, Lee told him to pick her up and they would drive together to obtain the drugs.

Before driving to Lee's house, Ackernecht met with Shannon Stewart, a N.I.S. agent who would pose as Ackernecht's friend and buy the drugs. Acevedo had decided Stewart would purchase the drugs "because [she] felt

that [Ackernecht] was clean cut and that it was known that he didn't do drugs." Acevedo also notified San Diego police.

Ackernecht and Stewart drove to Lee's home. From there Lee directed them to drive to a grocery store parking lot. Enroute, Lee explained she had only been able to purchase three of the four "quarters" and they were driving to a "friend's house" to purchase the remaining quarter gram.

Arriving in the parking lot, Lee sold the three quarters to Stewart, who (at Lee's request) tendered the entire purchase price ($100) to fund Lee's purchasing the additional quarter gram. Lee left Ackernecht's car, walked into an apartment complex, and was gone for 20 to 30 minutes.

Lee returned to Ackernecht's car with more methamphetamine. She sold it to Stewart and returned $15, saying she was only going to charge $85 for the four quarters. According to Stewart, Lee said this quarter gram was "from a different batch," "explained that some of the methamphetamine was made with acetone . . . and some of it has an ether base" and remarked "one of the two, made her break out and the other one didn't." Lee snorted some methamphetamine in Ackernecht's car.[2] Driving back to the submarine base, Lee told Stewart she could supply drugs for larger purchases with adequate notice.

At trial, Lee admitted selling methamphetamine to Stewart. She also admitted being in Ackernecht's barracks the night he saw her selling drugs, but denied she sold or used drugs, instead claiming Ackernecht was groggy, the room was only lit by candlelight, and any discussion about money concerned sailors collecting money to buy her gasoline to get home. Lee denied *ever* using drugs, specifically denied snorting methamphetamine in Ackernecht's car, and denied ever selling drugs other than this one time.

Explaining why she sold drugs to Stewart, Lee claimed she was entrapped by Ackernecht's befriending her. According to Lee, Ackernecht "asked me repeatedly over and over again to get him some drugs for a friend of his who was going to go get them down on the beach." Lee testified she was concerned about anyone buying drugs at the "beach" because a friend of hers "had gotten some drugs down on the beach and it messed her up really bad." Lee testified she finally capitulated to Ackernecht's 15 requests for drugs and sold Stewart methamphetamine, apparently out of friendship for Ackernecht, concern for his friend buying "beach" drugs, and because she was "getting tired of constantly hearing about it." Describing the depth of

---

[2] In law enforcement vernacular, "she was in the process of chopping up some white powder on a mirror and nasally ingesting that powder."

their three-week friendship, Lee explained: "He seemed to kind of like me. I'm a very friendly person and I like to meet new people, especially new military people, so I can get all aspects of the military, seeing how I was going into the military. And he—he was friendly. He initiated conversations about basketball. Couple times we sat there and shot baskets into the trash can."

The court instructed the jury with, among other instructions, CALJIC[3] Nos. 4.60 (1979 3d rev.), 4.61 (1981 rev.) and 4.61.5 (1979 rev.) on entrapment, and 2.51 on motive. The jury found Lee guilty of selling methamphetamine. The court suspended imposing sentence and placed Lee on three years probation including, among other conditions, 90 days' local custody, consisting of two weekends in county jail and the remainder in the Electronics Surveillance Program.

II

DISCUSSION

### A. Entrapment as a Matter of Law

In California "the proper test of entrapment [is whether] the conduct of the law enforcement agent [was] likely to induce a normally law-abiding person to commit the offense[.]" (*People* v. *Barraza* (1979) 23 Cal.3d 675, 689-690 [153 Cal.Rptr. 459, 591 P.2d 947].) Unlike some other jurisdictions, in California entrapment focuses upon police conduct and not the defendant's predisposition. (*People* v. *Thoi* (1989) 213 Cal.App.3d 689, 694 [261 Cal.Rptr. 789].) Under California law, "matters [such as] the character of the suspect, his predisposition to commit the offense, and his subjective intent are irrelevant." (*People* v. *Barraza, supra,* 23 Cal.3d at pp. 690-691.)

Police conduct which only offers the suspect an opportunity to commit crime is not entrapment; however, "an appeal by the police that would induce such a person to commit the act because of friendship or sympathy, instead of a desire for personal gain" is entrapment. (*People* v. *Barraza, supra,* 23 Cal.3d at pp. 690-691.) Qualifying this statement, the Supreme Court has also stated, "There will be no entrapment, however, when the official conduct is found to have gone no further than necessary to assure the suspect that he is not being 'set up.' The police remain free to take reasonable, though restrained, steps to gain the confidence of suspects." (*Id.,* at fn. 4.)

---

[3] All CALJIC jury instructions referred to are from the 4th edition (1979).

 Entrapment is ordinarily a fact question. (*People* v. *Barraza, supra*, 23 Cal.3d at p. 691, fn. 6.) Here, Lee contends she established entrapment as a matter of law because the undisputed evidence shows she sold drugs out of *friendship* towards Ackernecht.

An appellate court will only find entrapment as a matter of law where "the evidence is so compelling and uncontradicted the jury could draw no other reasonable inference." (*People* v. *Thoi, supra*, 213 Cal.App.3d at p. 694.) Here, Lee's contention fails because there was substantial evidence Lee sold drugs to earn money, not out of friendship. Ackernecht testified Lee agreed to sell his friend drugs to earn money.

Moreover, even disregarding this evidence, the "friendship" between Lee and Ackernecht did not rise to the level requiring a conclusion of entrapment as a matter of law. Ackernecht and Lee knew each other for only three weeks. Although Ackernecht was friendly towards Lee, he was never alone with her in the barracks. There is absolutely no suggestion of any sexual relationship or even flirtation.[4] Even Lee describes their relationship in terms which belie any claim of intimacy. Gaining Lee's confidence by discussing basketball and throwing trash into a wastebasket is not an improper police practice, much less entrapment as a matter of law.

In rejecting Lee's argument, we acknowledge in *Barraza* the Supreme Court stated police cannot appeal to "friendship or sympathy" without having engaged in entrapment. (*People* v. *Barraza, supra*, 23 Cal.3d at p. 690.) However, on the same page *Barraza* states, "The police remain free to take reasonable, though restrained, steps to gain the confidence of suspects. A contrary rule would unduly hamper law enforcement . . . ." (*Id.,* at fn. 4.)

Lee construes "friendship" literally and contends she established entrapment as a matter of law because Ackernecht admitted he befriended her to arrange an undercover drug purchase. We disagree with this interpretation. *Barraza*'s "police remain free" clause modifies its "friendship or sympathy" phrase. *Barraza* states the police may "gain the confidence of suspects" through "reasonable, though restrained" steps. There is nothing unrestrained or unreasonable about a submariner, rightfully concerned with his shipmate's drug use, feigning a three-week casual relationship with a drug

---

[4] Compare these facts with the situation in *People* v. *Martinez* (1984) 157 Cal.App.3d 660, 668 [203 Cal.Rptr. 833] where the court implied it was entrapment as a matter of law for the police to use "an attractive young female undercover agent . . . introduced to appellant by a friend who was a known prostitute, and generally, acting the part of a loose woman who might trade sexual favors for narcotics . . . ."

seller in which the most intimate moment was spent throwing trash into a wastebasket.

Friendship ranges a spectrum of depth and emotions. People have "best friends," "dear friends," "close friends," "fair-weather friends," "friends," and "acquaintances," among others. Construing *Barraza*'s proscription against police appeals to "friendship or sympathy" in context, as we must, the type of casual, brief, non-intimate acquaintance between Lee and Ackernecht shown by the undisputed evidence here is not entrapment as a matter of law, but instead is the type of "reasonable, though restrained" steps *Barraza* permits law enforcement to gain the suspect's confidence. ▪ *Barraza* adopted the so-called "objective" test of entrapment to guard against socially undesirable police "persuasion, pressure, and cajoling." (*People* v. *Barraza, supra,* 23 Cal.3d at p. 688.) Consistently with this purpose, in California people need not fear their "friend" is a police informer and nothing said herein defeats that goal. On this record, however, Lee simply failed to establish the type of "friendship" needing such protection.

▪ In summary, it is the jury's province to determine the witness's credibility. (*People* v. *Thoi, supra,* 213 Cal.App.3d at p. 695.) Here, the jury was entitled to and apparently did reject Lee's testimony that Ackernecht badgered her into selling him drugs. Instead, the jury apparently believed Ackernecht's testimony Lee sold drugs to earn money.[5] Selling drugs to earn money is not entrapment. ▪ Moreover, the undisputed facts show Ackernecht did not appeal to a level of "friendship" prohibited by *Barraza.* Accordingly, the court properly submitted the entrapment issue to the jury.

### B. Jury Instructions—Entrapment

Without objection, the court gave CALJIC Nos. 4.60 (1979 3d rev.), 4.61 (1981 rev.) and 4.61.5 (1979 rev.) regarding entrapment. These instructions define entrapment as conduct that "would likely induce a normally law-abiding person to commit the crime." This definition repeats, almost verbatim, the "test" stated by the Supreme Court in *People* v. *Barraza, supra,* 23 Cal.3d 675.[6]

---

[5] Lee's returning $15 to Stewart is not necessarily inconsistent with her profit motive. There was no evidence regarding the price Lee paid for the methamphetamine.

[6] CALJIC No. 4.60 states, "It is a defense that the commission of the alleged criminal act was induced by the conduct of law enforcement agents . . . when the conduct was such as would likely induce a normally law-abiding person to commit the crime."

CALJIC No. 4.61 states in part, "[W]hile the inquiry must focus primarily on the conduct of the law enforcement agent . . . it should also be judged by the effect it would have on a normally law-abiding person situated in the circumstances of the case at hand."

*People* v. *Barraza, supra,* 23 Cal.3d 675, 689-690 states, "[T]he proper test of entrapment in California is the following: was the conduct of the law enforcement agent likely to induce a

■ Citing *People* v. *Martinez, supra*, 157 Cal.App.3d 660, Lee contends these instructions misstate *Barraza* and require her conviction to be reversed. In *Martinez,* the court held the phrase "normally law-abiding person" in these instructions erroneously focuses on the defendant's character (whether she was predisposed to commit the crime) rather than police conduct. *Martinez* states the holding in *Barraza,* adopting an objective standard focusing on police misconduct in determining whether entrapment occurred, would be better effectuated by instructions that do not use the phrase "normally law-abiding person."

The fundamental problem with Lee's argument and with *Martinez*'s analysis of the issue is "the challenged term comes straight from *Barraza.*" (*People* v. *Kelley* (1984) 158 Cal.App.3d 1085, 1096 [205 Cal.Rptr. 283] [rejecting *Martinez*].) Every published opinion other than *Martinez* which has addressed this issue has held the challenged CALJIC instructions correctly state the law. These decisions have held the objective test of entrapment is properly expressed by CALJIC Nos. 4.60 (1979 3d rev.), 4.61 (1981 rev.) and 4.61.5 (1979 rev.). (*People* v. *Slatton* (1985) 173 Cal.App.3d 487, 491 [219 Cal.Rptr. 70]; *People* v. *Arthurlee* (1985) 168 Cal.App.3d 246, 251 [214 Cal.Rptr. 5]; *People* v. *Kelley, supra,* 158 Cal.App.3d at p. 1097 ["The language in the instruction is drawn directly from *Barraza.* [Citation.] To the extent that this language is not consistent with an objective test of entrapment, defendants' remedy is to seek review in the higher court."]; *People* v. *Grant* (1985) 165 Cal.App.3d 496, 500 [211 Cal.Rptr. 343].)

We agree with the weight of authority which has rejected this portion of *Martinez.*[7] Contrary to *Martinez*'s assertion, in context the phrase "normally law-abiding citizen" does not "strongly emphasize" the defendant's predisposition to commit crime. The instructions do not limit the entrapment defense to law-abiding persons. Rather, they focus the jury's attention on the officer's conduct in a hypothetical sense—its effect on a "normally law-abiding person." This hypothetical is similar to the "reasonable person" standard defining negligence in civil cases. Nowhere do any of the challenged instructions require or intimate a defendant who is not "normally law-abiding" is not entitled to the entrapment defense. To the contrary,

normally law-abiding person to commit the offense?" (Fn. omitted.) The court in *Barraza* adds, "[W]hile the inquiry must focus primarily on the conduct of the law enforcement agent . . . it should also be judged by the effect it would have on a normally law-abiding person situated in the circumstances of the case at hand." (*Id.,* at p. 690.)

[7] The Supreme Court denied review in *People* v. *Kelley, supra,* 158 Cal.App.3d 1085, *People* v. *Arthurlee, supra,* 168 Cal.App.3d 246, and *People* v. *Slatton, supra,* 173 Cal.App.3d 487. No petition for review was filed in *People* v. *Martinez, supra,* 157 Cal.App.3d 660 or in *People* v. *Grant, supra,* 165 Cal.App.3d 496.

CALJIC No. 4.61 (1984 rev.), given here, specifically instructs, "*Such matters as the character of the defendant, his predisposition to commit the offense, and his subjective intent are not relevant to the determination of the question of whether entrapment occurred.*" (Italics added.) Accordingly, the court properly instructed the jury on entrapment.

### C. *Evidence of Uncharged Crime*[8]*

. . . . . . . . . . . . . . . . . . . . . . .

### D. *Exclusion of Hearsay Evidence*

Ackernecht testified three sailors purchased and ingested drugs with Lee in the barracks on April 29, one of whom was Dane Hunt. Attempting to impeach Ackernecht by showing Hunt was not there, Lee examined Hunt as follows:

"Q. Okay. Do you recall being in Ernie's room around midnight on the 29th of April with Dorothy Lee . . . .

"A. No, I don't.

"Q. Now, do you recall how it is that you know you weren't there on the 29th of April?

"A. Yes. I had duty that day.

"Q. How do you know you had duty on that day?

"A. On that day we went through our logs—we keep logs in our ship to see when we had duty—we did go through our logs and check. And I did have duty that day.

"Q. Who went through the logs?

"A. E.M.T. Sumners.

"Q. And what would the log reflect—

"[Prosecutor]: Objection. Hearsay.

---

[8] In an unpublished portion of this opinion we determine admitting evidence of the uncharged drug sale was harmless error.

*See footnote 1, *ante,* page 829.

"The Court: Sustained."

At side bar, Lee asserted Hunt could testify about the content of the ship's log under the "state of mind" exception to the hearsay rule. Counsel also implied the question was proper because Hunt refreshed his recollection from the ship's log. ■ On appeal, Lee contends the court improperly sustained the objection and the error was prejudicial because the answer would have impeached Ackernecht whose credibility was critical to the success of the People's case.

The court properly sustained the objection. Asking Hunt to testify about the content of the log (an out-of-court statement offered to prove the truth of the matter asserted—that Hunt was not in the barracks because he was on duty) calls for hearsay. The state of mind exception is inapplicable. The log entry reflects Hunt's state of mind only in the sense that any statement of a past event is a statement of the declarant's then-existing state of mind— his memory or belief about the past event. Evidence Code section 1250, subdivision (b), the state of mind exception to the hearsay rule, provides, "This section does *not* make admissible evidence of a statement of memory or belief to prove the fact remembered or believed." (Italics added.) Accordingly, under section 1250, subdivision (b), the state of mind hearsay exception was inapplicable.

The court also properly overruled the other asserted ground for admissibility—the document was used to refresh Hunt's recollection. A witness may refer to hearsay to refresh his recollection; however, before doing so the witness must testify he cannot remember the fact sought to be elicited. (Imwinkelried et al., California Evidentiary Foundations (1988) p. 282.) Hunt did not so testify. Even more fundamentally, where a writing is used to refresh recollection, *the adverse party* can introduce relevant portions of it into evidence under Evidence Code section 771, but the examining party may not. "The writing is used by the witness solely to assist him in giving his oral testimony. It has no independent evidentiary value for the party calling him, and is not admissible in evidence at his instance." (3 Witkin, Cal. Evidence (3d ed. 1986) Introduction by Adverse Party, § 1835, p. 1792.) In any event, even if the court did err in excluding testimony about the log, any error would be harmless. Hunt contradicted Ackernecht by testifying he was not present when Lee allegedly sold drugs in the barracks, but was instead on duty. Asked, "How do you know you had duty on that day?" Hunt responded, "We went through our logs . . . [a]nd I did have duty that day." The obvious inference is the log showed Hunt was on duty. Any error in excluding the response to the more specific question, "What did the log reflect?" is harmless because the fact the log showed Hunt was on duty came into evidence through a previous question.

## E. Instructional Error on Motive

Over defense objection, the court instructed the jury with CALJIC No. 2.51 on motive: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled." ■ Having admitted selling methamphetamine to Stewart—the charged offense—but defending on the basis of entrapment, Lee contends her motive is irrelevant and the court erred in instructing with CALJIC No. 2.51. We agree.

Lee's trial occurred in November 1988. The Comment to CALJIC No. 2.51 appearing in the *January 1987* pocket part to the fourth edition of CALJIC states: "CALJIC 2.51 should not be given where defendant admits the criminal act but claims entrapment as a defense." This Comment has been continued in the CALJIC's 1988 fifth edition. The court erred because having admitted the offense and relying on entrapment (in California, an objective standard focusing on police conduct where the defendant's intent is irrelevant), the defendant's motive is irrelevant.

Where, as here, the court gives a legally correct, but irrelevant, instruction, the error "is usually harmless, having little or no effect 'other than to add to the bulk of the charge.'" (*People* v. *Rollo* (1977) 20 Cal.3d 109, 123 [141 Cal.Rptr. 177, 569 P.2d 771], citation omitted.) Attempting to avoid the impact of this rule, citing *People* v. *Martinez, supra,* 157 Cal.App.3d 660, Lee contends the error is prejudicial. We disagree.

In *Martinez,* the court first held the CALJIC instructions on entrapment were legally incorrect because they improperly focused the jury's attention on the defendant's intent and character. With this premise, not surprisingly the court in *Martinez* found the motive instruction prejudicial because it, too, directed the jury's attention to the defendant's state of mind. (*People* v. *Martinez, supra,* 157 Cal.App.3d at p. 669.)

*Martinez* is not controlling on the issue of prejudice flowing from improperly instructing on motive because, as discussed earlier, we follow the weight of authority concluding the CALJIC entrapment instructions accurately state the law by directing the jury's attention to the effect of law enforcement conduct on a hypothetical normally law-abiding person. Because *Martinez*'s premise is incorrect, its conclusion giving CALJIC No. 2.51 in these circumstances is prejudicial error is also incorrect. Giving CALJIC No. 2.51 was not prejudicially misleading. The court instructed

the jury to apply the instructions as a whole (CALJIC No. 1.01 (1979 rev.)) and that all instructions were not necessarily applicable (CALJIC No. 17.31). Given the Supreme Court's statement such errors are "usually harmless," under these circumstances it is not reasonably probable a result more favorable to Lee would have occurred without CALJIC No. 2.51.

## III

### DISPOSITION

Judgment affirmed.

Benke, Acting P. J., and Huffman, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 18, 1990.