Filed 3/28/13  P. v. Morton CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JEFFERSON CHARLES MORTON,<br><br>        Defendant and Appellant. | A128706<br><br>(Napa County<br>Super. Ct. No. CR148165) |

Defendant Jefferson Charles Morton appeals a judgment entered on a jury verdict finding him guilty of burglary, petty theft with a prior, resisting a police officer, and attempted criminal threats.  We shall reverse defendant's convictions for attempted criminal threats and resisting a police officer, as well as his convictions on one of the burglary counts and one of the theft counts, and otherwise affirm the judgment.

## I.  BACKGROUND

Defendant was charged by information with making criminal threats, a felony (Pen. Code,[1] § 422) (count one); second degree commercial burglary, a felony (§ 459) (counts two, three, four, five, six, seven, and eight); petty theft with a prior, a felony (§ 666) (counts nine, ten, eleven, twelve, and thirteen); and resisting, obstructing, or delaying a peace officer, a misdemeanor (§ 148, subd. (a)(1)) (counts fourteen, fifteen, sixteen, and seventeen)).  The information also alleged prior convictions and prison

---

[1] All undesignated statutory references are to the Penal Code.

terms.  (§§ 667.5, subd. (b) & 1203, subd. (e)(4).)  At trial, count one was amended to allege attempted criminal threat.

Defendant had several prior convictions, including two in 1994 for misdemeanor sexual battery.  (§§ 243.4, subd. (a) & 17, subd. (b)(4).)  As a result of that conviction, defendant was required to register as a sex offender.  (§ 290, subd. (c).)[2]

In the late summer or fall of 2009, two women in the City of Napa had disturbing encounters with defendant.  One of them, Sandra S.,[3] met him in the pool area of her apartment complex.  Their conversation was pleasant at first.  Defendant then mentioned he had been falsely accused and arrested or held for "those murders of the girls."  He said he was the boyfriend of "the girl at Shelter Creek," or had some other association with her.  Sandra was confused because she thought there had been only one suspect in the murders defendant was discussing.  Sandra was uncomfortable, and in an effort to get away politely, she commented on defendant's ring and said his wife was probably waiting for him.  Defendant said "I'm not married, my mother gave me this ring, but I'll take it off if it makes you uncomfortable."  At one point in the conversation, Sandra folded her arms across her chest, and defendant said, "Thank you for being modest."

A day or two later, defendant knocked on Sandra's apartment door and asked if she was home.  Sandra's adult daughter said Sandra was not home.  Although Sandra had

---

[2] Defendant points out that the 1994 plea waiver form stated that registration was not required.  Under the version of the Sex Offender Registration Act (§ 290 et seq.) in effect at the time of his 1994 conviction, section 243.4 was not one of the enumerated offenses that triggered the requirement to register as a sex offender.  (See Stats. 1993, ch. 555, § 1, pp. 2781–2785; see also Stats. 1993, ch. 589, § 109, pp. 3015–3019; Stats. 1993, ch. 595, § 8, pp. 3134–3135.)  Since that time, the Legislature has added a violation of section 243.4 as one of the convictions that triggers the registration requirement.  (§ 290, subd. (a).)  This change applies to crimes committed at any time:  the Sex Offender Registration Act provides that "[t]he registration provisions of the Act are applicable to every person described in the Act, without regard to when his or her crime or crimes were committed or his or her duty to register pursuant to the Act arose, and to every offense described in the Act, regardless of when it was committed."  (§ 290.023.)

[3] In the interest of privacy, we will refer to Sandra S. and the other woman, Kathleen W., by their first names.  We intend no disrespect.

2

not invited defendant to visit her, he told Sandra's daughter that she had done so. Defendant made Sandra uncomfortable, and she asked the manager what she knew about him. The manager called the police. Sandra told the police about her contacts with defendant.

The other woman, Kathleen W., met defendant at the city library. He came up to her as she looked for a book and told her he had been watching her and he thought she was adorable. As she checked a book out, he approached her again and introduced himself. She dropped her library card, which had her name on it. Defendant picked it up and looked at it before returning it to her. On another occasion, he spoke to her at a store, and asked her to have coffee with him. She said she was busy. He wrote his phone number on a piece of paper and gave it to her. Kathleen ended the conversation. The next time Kathleen encountered defendant, at the Silverado Plaza shopping center, defendant approached and asked why she had not called him. She told him she had been busy. Defendant said he still wanted to see her, and wrote his number down for her again, asking her to call him so they could get together. Kathleen again said she was busy.

Defendant began calling Kathleen and leaving messages, sometimes up to three a day. After defendant had left many messages for Kathleen, he left one telling her he was upset that she was not returning his calls and saying, "[M]aybe this is your way of letting me know that I'm not a priority." She found the message "almost scary," called him back, and left a message saying she did not want to be in a relationship, that she was busy, and that she did not want him to call. He continued to leave messages for her, often telling her he had been thinking of her or that he liked the way she moved and walked. The messages seemed to her to be "kind of off."

In the late summer, Kathleen saw defendant as she was on a river trail where she often walked. He asked her why she had not returned his calls. She asked him how he had gotten her phone number, and he said he had found it in the phone book. She said she had been busy and was not available. He kept walking with her. He told her he had mistakenly been put on death row for the brutal murders of two women. He seemed

agitated as they spoke. There was no one else on the trail, and Kathleen was frightened. Defendant continued to walk with her, and told her he had not committed the crimes. He told her, "Men can be very evil. Men can be very, very evil." After the conversation in which defendant talked with Kathleen about the murders, she called the police because she was frightened. She saw defendant several more times on the river trail.

Detective Darlene Elia of the Napa Police Department worked with those required to register as sex offenders, including defendant. In August 2009, she began getting calls from businesses letting her know that defendant was acting strangely. She also received Sandra and Kathleen's reports about defendant's behavior. She was concerned because defendant's behavior appeared to be "escalating," and she believed he might be fantasizing about harming women. On September 17, 2009, she met with defendant, a sheriff's detective, and a parole agent. She asked defendant about the incidents with Sandra and Kathleen, and told him the police would place a notice in the newspaper to let the public know about his behavior. She believed that there was a risk to the community and that it was her duty to notify the public pursuant to section 290.45, which authorizes law enforcement agencies to provide information to the public about sex offender registrants "when necessary to ensure the public safety based upon information available to the entity concerning that specific person." (§ 290.45, subd. (a).)

Elia originally planned to make a newspaper notification, but the newspaper refused to print it. Elia prepared flyers with information about defendant and decided to post them at Silverado Plaza, a shopping center defendant frequented and where businesses had complained of his activities. She and another police officer went to businesses at Silverado Plaza on September 23, 2009, and asked to have the flyers posted in their windows. Later that day, defendant went to various businesses in Silverado Plaza and pulled down the flyers. He was yelling and seemed angry. He tore down posters in Starbucks, Great Clips, and High Tech Burrito. A bystander near the Starbucks saw him "reaching around inside the stores and pulling fliers off"; she saw him enter Starbucks and tear down a flyer. Defendant did not say anything before taking down the poster in High Tech Burrito. Outside the Starbucks, he yelled, "[T]his isn't justice." In Great

4

Clips, he tore the posters down, saying "[W]e're all friends around here, I don't know why you'd let these people put this poster up about me." Some of the business owners called the police to report defendant's actions, and expressed concern because defendant had been so upset.

The next day, September 24, 2009, Elia and the other officer returned to Silverado Plaza and posted flyers in various businesses. Before posting the flyers, they obtained permission from the store managers. The flyers had been modified to say they were the property of the police department and should not be removed or destroyed without authorization. The same day, defendant entered several businesses. He walked into a Radio Shack and removed the flyers. A police officer who was watching defendant saw that he had a conversation in the Radio Shack, but he could not hear the conversation. Defendant left the Radio Shack, looking agitated, and the officer went into the store and told the people there that he was with the police and that defendant was being watched. Defendant went into Great Clips and tore the flyers down, saying "It's not very nice," and "[W]e're all friends around here," in an angry tone, then left the store. He did not ask for permission to remove the posters.[4] He went into New York Pizza Kitchen, appearing agitated and speaking loudly. Referring to the flyer in the window, he said to the owner, "You don't have to do this. You don't have to go there." To appease him, the owner removed the flyer. The employees of the Starbucks in the shopping center locked the door, with employees and customers inside. Defendant tried to get in, shook the door violently, and yelled something about the flyers, then walked away, saying, "[I]t's your life." He appeared to be getting increasingly agitated.

Defendant entered a restaurant named Hop Hing's, and asked the owner, Bailey Huang, to remove the poster. He became upset when Huang refused. Defendant said something like, "I feel sorry for your family and feel sorry for the restaurant." He mentioned feeling sorry for Huang's children. He left the restaurant saying something to

---

[4] A private investigator testified on defendant's behalf that an employee of the salon told her a few days after the incident that defendant asked for permission to remove the posters from the salon, although he did not receive permission.

5

the effect that it was not over yet. He did not take down any flyers before leaving. Huang asked one of the employees to take over the cooking, then went out and confronted defendant. Huang testified that he asked defendant exactly what he had meant by what he said in the store, saying something like, "[D]id you threaten me?" A police officer who was following defendant testified that Huang came out of the restaurant, telling defendant something like, "[Y]ou will not threaten my family." Defendant immediately said, "[T]hat's not what I meant." Huang was visibly upset; his fists were clenched and his face appeared red. He testified that defendant' statement had bothered him "[a] little bit." When asked if defendant's words had made him afraid, he testified, "I wasn't afraid for myself, but I was more upset about, you know, he was threatened my restaurant [*sic*], I was kinda more upset about that." His family sometimes came to the restaurant on weekends to visit and play.

The police officer who had been following defendant arrested him. The parties stipulated that "the police seized three posters which were the property of the Napa Police Department from Mr. Morton on September 24th, 2009."

Dr. David Kan testified on defendant's behalf as an expert in forensic psychiatry. He opined that defendant was diagnosable with Asperger's disorder. As the basis for that diagnosis, he explained that defendant had difficulties with peer-appropriate relationships; difficulties with social interaction, including difficulty maintaining eye contact and connecting emotionally or socially with other people; and persistent repetitive body movements. When Dr. Kan met with defendant, he noted that it was difficult for defendant to maintain the normal back-and-forth of conversation, and that defendant "didn't understand what [Kan] was trying to tell him socially."

The jury found defendant guilty of attempted criminal threats (count one), five counts of second degree commercial burglary (counts two, three, six, seven, and eight), five counts of petty theft (counts nine, ten, eleven, twelve, and thirteen), and two counts of obstructing or delaying a peace officer (counts fourteen and sixteen). It found him not guilty on the remaining counts. The court found the prior conviction and prison term

6

allegations to be true. Defendant was sentenced to serve five years in prison for the felonies, with a consecutive 326-day jail term for the misdemeanors.

## II. DISCUSSION

### A. Exclusion of Evidence of Defendant's Post-Arrest Statements

Defendant contends the trial court abused its discretion in excluding evidence of his out-of-court statements. He particularly challenges the exclusion of a video recording made after his arrest, while he was still at the shopping center; the exclusion of certain statements he made when Elia interviewed him on September 17, 2009, before the flyers were posted; and evidence of his response to Huang's question about whether he was threatening Huang. We review the trial court's rulings on the admissibility of evidence for abuse of discretion. (See *People v. Rowland* (1992) 4 Cal.4th 238, 264; *People v. Clair* (1992) 2 Cal.4th 629, 671.)

In the video made shortly after his arrest, defendant made exculpatory statements. Among those statements, he denied that he had made any threats, he said he had called his lawyer and "she said it was ok," and he said he "didn't do that stuff." The trial court granted the People's motion to exclude the video from evidence at trial, concluding the statements were self-serving and untrustworthy. Defendant contends this evidence was admissible because it was offered for a non-hearsay purpose, i.e., to show the behavior and speech patterns characteristic of his Asperger's syndrome, and to show his state of mind, i.e., his intent when he was talking to Huang.

We are not persuaded. It is well established that " ' "[a] defendant in a criminal case may not introduce hearsay evidence for the purpose of testifying while avoiding cross-examination." ' " (*People v. Gurule* (2002) 28 Cal.4th 557, 605.) Defendant is correct that Evidence Code section 1250 provides that evidence of a statement of the declarant's state of mind is not made inadmissible by the hearsay rule under certain circumstances, including when "[t]he evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action." (Evid. Code, § 1250, subd. (a)(1).) Even assuming this rule would apply to defendant's post-arrest statements—a point we do not decide—the trial court did

7

not abuse its discretion in refusing to admit them. The trial court relied for its ruling on Evidence Code section 1252, which provides, "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness." The trial court concluded defendant's post-arrest statements were self-serving and untrustworthy, and hence inadmissible under Evidence Code section 1252. We cannot fault this ruling. As explained in *People v. Edwards* (1991) 54 Cal.3d 787, 820, "To be admissible under Evidence Code section 1252, statements must be made in a natural manner, and not under circumstances of suspicion, so that they may carry the probability of trustworthiness. Such declarations are admissible only where they are ' "made at a time when there was no motive to deceive." ' " At the time he spoke with the police officers, defendant was under arrest, and he knew he was suspected of threatening Huang and taking the flyers. The trial court could reasonably conclude his denials and explanations were self-serving and untrustworthy.

Defendant also contends the trial court abused its discretion when it allowed the prosecutor to elicit testimony about his statements in the September 17, 2009 interview, but refused to permit defendant to introduce evidence of his statements in the same interview. At the outset of trial, the court granted defendant's request to exclude the videotape of the interview. During her testimony about her interview with defendant, Detective Elia discussed various statements defendant had made during that interview: he denied that he had told Sandra he was on death row, he said Sandra had invited him to her apartment; he initially denied knowing Kathleen at all, and then denied that he had called her and said that she had been the one calling him; and he said Sandra and Kathleen were lying. At the outset of this line of questioning, defense counsel raised a hearsay objection, which the trial court initially sustained; after an off-the-record bench conference, the court allowed the prosecutor to continue with her questions. On cross-examination, defense counsel asked Elia about whether defendant had expressed confusion about Kathleen's identity, as she used both her maiden name and married name at different times. The trial court sustained the prosecutor's hearsay objection.

8

Defendant contends the trial court abused its discretion to allowing the prosecution to introduce testimony about his statements at the September 17, 2009 interview, while excluding evidence of exculpatory statements. Even assuming the trial court abused its discretion in allowing the prosecutor, but not defendant, to question Elia about defendant's statements, defendant has not met his burden to show prejudice, that is, that it was reasonably probable the verdict would have been more favorable to defendant absent the ruling. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1325, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) Defendant's encounters with Sandra and Kathleen were relevant only to show the reason the police posted the flyers; they did not directly establish any of the elements of the crimes with which he was charged. There is no basis to conclude the evidentiary rulings affected the verdict.[5]

Defendant also challenges the trial court's rulings on the admissibility of evidence of what he said after Huang challenged him. Although the officer testified that defendant replied, "[T]hat's not what I meant" after Huang said, "[Y]ou will not threaten my family," the trial court sustained the prosecutor's hearsay objections when defense counsel tried to elicit further testimony about defendant's response. We need not decide whether these rulings were proper, because we are reversing the conviction of attempted criminal threat on another ground. (See part II.H, *infra*.)

## B. Were Theft and Burglary Charges Proper?

Defendant contends he was improperly charged with the general crimes of petty theft with a prior and burglary, because the more specific statutes prohibiting vandalism

---

[5] The jury was instructed that to prove the crime of obstructing or delaying a peace officer, the jury must show, inter alia, that the officers were *lawfully* performing their duties. Even if the excluded statement may have had some bearing on that issue, the result here would be the same, as we are reversing those convictions on another ground. (See part II.I, *infra*.)

(§ 594, subd. (a)) and destruction or removal of a public notice (§ 616) applied to his actions.

Our Supreme Court has explained that under the rule of *In re Williamson* (1954) 43 Cal.2d 651, 654 (*Williamson*), "if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute. In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute. [Citation.] . . . 'The doctrine that a specific statute precludes any prosecution under a general statute is a rule designed to ascertain and carry out legislative intent. The fact that the Legislature has enacted a specific statute covering much the same ground as a more general law is a powerful indication that the Legislature intended the specific provision alone to apply. Indeed, in most instances, an overlap of provisions is determinative of the issue of legislative intent and "requires us to give effect to the special provision alone in the face of the dual applicability of the general provision . . . and the special provision . . . ." [Citation.]' [Citation.] [¶] Absent some indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' " (*People v. Murphy* (2011) 52 Cal.4th 81, 86 (*Murphy*); see also *People v. Jenkins* (1980) 28 Cal.3d 494, 502, 505–506 (*Jenkins*).)

As relevant here, vandalism in violation of section 594, subdivision (a), occurs when a person maliciously damages or destroys real or personal property not his own. A violation of section 616 occurs when a person "intentionally defaces, obliterates, tears down, or destroys . . . any proclamation, advertisement, or notification set up at any place in this State, by authority of any law of the United States or of this State . . . ." Defendant claims he should have been charged with those crimes rather than burglary and petty theft

10

with a prior. As applicable here, a burglary occurs when a person enters a shop or store "with intent to commit grand or petit larceny or any felony." (§ 459.) Petty theft with a prior occurs when a person with the requisite prior convictions commits petty theft (§ 666); theft is defined in part as feloniously stealing or taking the personal property of another. (§ 484, subd. (a)); see also § 488.) To steal property or obtain it by theft, a person must intend "to *permanently* deprive the owner of possession of the property." (*People v. MacArthur* (2006) 142 Cal.App.4th 275, 280.)

Defendant contends these statutes fall within the rule of *Jenkins* and *Williamson*, arguing that "[t]aking down or destroying an official notice commonly will involve at least temporar[il]y taking and moving the notice." Although this is a close issue, we must reluctantly reject defendant's contention. There is no evidence defendant destroyed the flyers, and neither vandalism (§ 594, subd. (a)) nor removing a public notice (§ 616) necessarily or commonly involve the intent to deprive the owner of *possession* of the property. Nor do they involve entering a store or other building with the intent to commit larceny or a felony. While defendant's conduct may have also violated section 594 or 616, it was not improper to charge him with petty theft and burglary.

## C. Entrapment

The trial court refused defendant's request that the jury be instructed on the defense of entrapment, ruling there was no substantial evidence to support that defense. Defendant contends this ruling was error.

It is well established that " ' "[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense*." ' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) We review the trial court's ruling de novo. (*Ibid*.)

"In California, the test for entrapment focuses on the police conduct and is objective. Entrapment is established if the law enforcement conduct is likely to induce a *normally law-abiding person* to commit the offense. [Citation.] '[S]uch a person would

11

normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the subject by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime.' " (*People v. Watson* (2000) 22 Cal.4th 220, 223 (*Watson*), quoting *People v. Barraza* (1979) 23 Cal.3d 675, 690 (*Barraza*).) Entrapment may be established " 'if the actions of the law enforcement agent would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent,' " or if there was " 'affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person.' " (*Watson*, *supra*, 22 Cal.4th at p. 223.) To decide whether this test is met, we may look to "the transactions preceding the offense, the suspect's response to the inducements of the officer, the gravity of the crime, and the difficulty of detecting instances of its commission." (*Barraza*, *supra*, 23 Cal.3d at p. 690.) However, "such matters as the character of the suspect, his predisposition to commit the offense, *and his subjective intent are irrelevant*." (*Id*. at pp. 690–691, fn. omitted, italics added.)

Defendant argues that the police entrapped him by posting "highly inflammatory posters" on the second day, knowing they could "make him [tear them down] again." According to defendant, he "tore down the libelous posters because that is the objective of someone who is not a dangerous sex offender when the police do something as outrageous as posting announcements that say that the person is a dangerous sex offender. That's what people who are not dangerous sex offenders do." He appears to take the position that the police left him no option other than this "self-help" remedy.

We disagree. As noted in *Barraza*, the suspect's subjective intent is irrelevant to a defense of entrapment. (*Barraza*, *supra*, 23 Cal.3d at pp. 690–691.) However upset

12

defendant may have been by the flyers, there is no basis to conclude the police entrapped him by posting the flyers a second time.

Defendant also argues that section 290.45 did not authorize the police to post flyers notifying the public about him, and that the decision to post them violated his due process rights. Section 290.45, subdivision (a)(1), authorizes law enforcement entities to "provide information to the public about a person required to register as a sex offender pursuant to Section 290, by whatever means the entity deems appropriate, when necessary to ensure the public safety based upon information available to the entity concerning that specific person." Under subdivision (c)(1) of that statute, the law enforcement entity "may authorize persons and entities who receive the information pursuant to this section to disclose information to additional persons only if the entity determines that disclosure to the additional persons will enhance the public safety and identifies the appropriate scope of further disclosure. A law enforcement entity may not authorize any disclosure of this information by its placement on an Internet Web site." According to defendant, this means that information must be distributed in a "very controlled" manner. We do not read the statute to limit the ability of the *law enforcement entity* to distribute information about sex offenders in a manner that it deems appropriate. (§ 290.45, subd. (a)(1).) In any case, even if defendant is correct that his rights were violated, he has not shown that he was authorized to resort to self-help by entering businesses and stealing the posters.

### D.  Claim of Right

At defendant's request, the jury was instructed on the "claim of right" defense pursuant to CALCRIM No. 1863, as follows: "If the defendant obtained property under a claim of right[,] he did not have the intent required for the crime of theft. The defendant obtained property under a claim of right if he believed in good faith that he had the right to the specific property and he openly took it. [¶] In deciding whether the defendant believed he had a right to the property and whether he held that belief in good faith,

13

consider all the facts known to him at the time he obtained the property along with all the other evidence in the case. [¶] The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith. [¶] The claim of right defense does not apply if the defendant attempted to conceal the taking at the time it occurred or after the taking was discovered. The claim of right [defense] does not apply if the claim arose from activity commonly known to be illegal or known by the defendant to be illegal. If you have a reasonable doubt about whether the defendant had the intent required [for theft] you must find him not guilty of theft."

Defendant makes two challenges related to the claim-of-right defense. He contends, first, that the trial court erred in giving the instruction quoted above. According to defendant, the phrase "had a right to" the property implies that the defendant must have claimed an ownership interest. He argues that the court should instead have tailored an instruction that would be consistent with his position that he took the posters to remove them from public view because he believed they had been posted unfairly, rather than because he believed he owned them. (See *People v. Russell* (2006) 144 Cal.App.4th 1415, 1424 [court has duty to instruct, *sua sponte*, on defenses and relationship of those defenses to charged offense, where it appears defendant is relying on defense].)

We reject this contention. Defendant contends not that the instruction was itself erroneous, but that it did not highlight the nature of his defense. However, it is well established that "[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) Not only did defendant not request clarification, but he himself requested the instruction. In fact, his counsel argued that under the instruction, the claim of right defense was not limited to cases in which the defendant believed the property was his, and that it was applicable

14

here, where defendant contended he took the posters down because, in his view, "this [wasn't] justice" and he had a right to do so. In the circumstances, defendant may not be heard to complain of the instruction on appeal. (See also *People v. Lara* (2001) 86 Cal.App.4th 139, 164 [error in failing to instruct jury was invited where defense counsel deliberately or expressly, as matter of trial tactics, caused the error].) In any case, defendant points to no case law or statutory authority that might have guided the court in framing an instruction. (See *People v. Michaels* (2002) 28 Cal.4th 486, 529 [trial court has no duty to instruct on principles of law that have not been established by authority].)

Defendant also contends the evidence was insufficient to show he intended to steal the posters because no evidence contradicted his claim-of-right defense. He argues he had no choice but to tear down the posters because no other remedy was available to him, that there was no evidence that he had any other motive for his actions than self-help, and that therefore there was no evidence he intended to steal the posters. We reject this contention. Defendant cites no authority to support his position that a person upset by a public notice has the right to remove it and take it away. A rule of law that one who disagrees with notification provided by a public entity is authorized to do so would contravene the purposes of section 290.45, and we decline to create such a rule.

## E. Instruction on Motive

The trial court instructed the jury on motive pursuant to CALCRIM No. 370 as follows: "The People are not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict you may, however, consider whether the defendant had a motive. Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

Defendant contends this instruction was given in error because his motive, i.e., to remove posters that offended him, tended to show he was *not* guilty under his claim-of-right defense. According to defendant, the instruction is proper only when there is a

15

question about whether the defendant committed the acts he was charged with. For this contention, he cites two cases holding that where the jury is instructed on entrapment, the standard instruction on motive should not be given. (*People v. Lee* (1990) 219 Cal.App.3d 829, 841; *People v. Martinez* (1984) 157 Cal.App.3d 660, 669.) Whether or not the reasoning of these cases applies here, where the jury was not instructed on entrapment, we see no prejudice. An error in giving an instruction that correctly states a principle of law but that does not apply to the facts of the case is normally harmless. (*People v. Rollo* (1977) 20 Cal.3d 109, 122–123.) We see no basis to conclude the motive instruction prevented the jury from understanding the defense or evaluating the evidence under the correct legal principles.

## F. Intrinsic Value of Property

Defendant contends the trial court erred by failing to instruct the jury properly that to find defendant guilty of theft by larceny, it must find the property had some intrinsic value. In California, to support a theft conviction, "the item of property need only have some intrinsic value, however slight." (*People v. Martinez* (2002) 95 Cal.App.4th 581, 585 (*Martinez*).)

The trial court instructed the jury on the elements of theft by larceny pursuant to CALCRIM No. 1800. In pertinent part, the instruction stated, "For petty theft, the property taken can be of any value, no matter how slight." Although this instruction does not use the word "intrinsic," it adequately informs the jury of the applicable legal principles.

Defendant also contends the evidence does not support a conclusion that the posters had any intrinsic value, arguing that they were "a few pieces of used-paper" with no market value, and had no intrinsic value. The case of *People v. Cueller* (2008) 165 Cal.App.4th 833, 838–839 (*Cuellar*), reaches a contrary conclusion. The defendant there had tried to pay for goods with a false check; when the sales clerk became suspicious and brought the check to the back office, the defendant went to the office and grabbed the

16

check from her hand. (*Id*. at p. 835.) He was convicted of grand theft from the person, and challenged the conviction on the ground that the forged check had no intrinsic value. (*Id*. at p. 836.) The Court of Appeal concluded the jury could reasonably infer the false check had intrinsic value by virtue of the paper it was printed on. (*Id*. at pp. 838–839.) In doing so, it relied on other cases upholding theft charges for items with minimal intrinsic value. (*Id*. at p. 839, citing *People v. Caridis* (1915) 29 Cal.App. 166, 169 [ticket for illegal lottery possessed "perhaps some slight intrinsic value, which, however small, would have sufficed to make the wrongful taking of it petit larceny"]; *Martinez*, *supra*, 95 Cal.App.4th at pp. 583–584, 586 [use of soap, shampoo, and hot water when taking shower after entering house]; *People v. Franco* (1970) 4 Cal.App.3d 535, 537–538 [empty cigarette carton].) Defendant acknowledges the holding of *Cueller*, but argues it was incorrectly decided and "renders the requirement of intrinsic value meaningless." We have reviewed *Cuellar* and the authorities upon which it relies, and decline defendant's invitation to disagree with it.

## G. Evidence of Intent to Take Down Posters

Defendant contends the evidence was insufficient to support a finding that he intended to take down the posters at the time he entered each business. To be guilty of burglary, a person must enter the premises with intent to commit larceny or any felony. (§ 459.) Therefore, defendant argues, his burglary convictions should be reversed.

"When reviewing the sufficiency of evidence to support a criminal conviction, we ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] We view the whole record in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence to determine whether the record discloses substantial evidence. [Citations.] 'Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support

17

it." (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1245.) Moreover, "[b]ecause intent is rarely susceptible of direct proof, it may be inferred from all the facts and circumstances disclosed by the evidence. [Citations.] Whether the entry was accompanied by the requisite intent is a question of fact for the jury. [Citation.] 'Where the facts and circumstances of a particular case and the conduct of the defendant reasonably indicate his purpose in entering the premises is to commit larceny or any felony, the conviction may not be disturbed on appeal.' [Citation.]" (*Ibid.*)

Defendant was convicted of five counts of burglary and five counts of theft. These convictions arose from the same incidents: his entries into Great Clips, Starbucks, and High Tech Burrito on September 23, and his entry into Radio Shack and Great Clips on September 24. As to each of those incidents, defendant was convicted of both burglary and theft. He was acquitted of the burglary counts arising from his entries into New York Pizza Kitchen and Hop Hing's on September 24.

Defendant contends that because he did not take down the flyers in New York Pizza Kitchen and Hop Hing's once he was denied permission, there is no evidence to show that he intended to remove the posters without permission when he entered the other businesses. There is direct evidence, however, that in Great Clips on both September 23 and 24 and in High Tech Burrito on September 23, defendant tore down flyers either without comment or without asking permission. There was also evidence from which the jury could infer that defendant did not receive permission to do so in the Starbucks on September 23. The jury could reasonably infer that defendant intended to tear down the posters when he entered the businesses.

We reach a different conclusion, however, as to defendant's contention that the evidence does not support his convictions of theft and burglary from Radio Shack (counts two and nine). The only evidence of what happened at Radio Shack is the testimony of a police officer who saw defendant walk into the store and remove the flyers. Defendant appeared to be having a conversation while he was inside, but the officer could not hear

18

it.  Defendant seemed agitated as he left the store.  There is no evidence of what he said in the store, or whether he received permission from store employees before removing the flyers.

The Attorney General argues that the posters were the property of the police department and no store employee could have authorized defendant to remove them.  We are unpersuaded.  The officers sought and received permission before posting the flyers, and there is no basis to conclude store employees could not give permission to remove them.  Accordingly, in the absence of evidence of what was said in Radio Shack, the record is insufficient to support the convictions on the counts related to defendant's actions in entering Radio Shack and removing the posters, and they must be reversed.

## H. Attempted Criminal Threat

Defendant raises a number of challenges to his conviction for making an attempted criminal threat to Huang.  Among them, he argues that the evidence does not show he made a sufficient threat to Huang.  We agree that his statements to Huang do not meet the standard for an attempted threat.

To establish a criminal threat under section 422, "[t]he prosecution must prove '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat—which may be "made verbally, in writing, or by means of an electronic communication device"—was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.'  [Citations.]"  (*In re George T.* (2004) 33 Cal.4th 620, 630.)

19

The threat need not be absolutely unequivocal, however. " 'The use of the word "so" indicates that unequivocality, unconditionality, immediacy, and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 340.) The determination of the question of whether the words are sufficient to meet this standard "can be based on all the surrounding circumstances and not just on the words alone." (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340 (*Mendoza*).) " '[I]t is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422.' [Citation.] The jury is 'free to interpret the words spoken from all of the surrounding circumstances of the case.' [Citation.]" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1433.) Thus, "[t]he surrounding circumstances must be examined to determine if the threat is real and genuine, a true threat." (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1137 (*Ricky T.*).)

Here, defendant was convicted not of *making* a criminal threat, but of *attempting* to do so. In *People v. Toledo* (2001) 26 Cal.4th 221, 224 (*Toledo*), our Supreme Court considered whether an attempted criminal threat constituted a crime, and concluded that it did. The court held, "a defendant may properly be found guilty of attempted criminal threat whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action. Furthermore, in view of the elements of the offense of criminal threat, a defendant acts with the specific intent to commit the offense of criminal threat only if he or she specifically intends to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat, under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to reasonably cause the person to be in

20

sustained fear for his or her own safety or for his or her family's safety." (*Id*. at pp. 230–231.)

The court went on to discuss the "potential circumstances [that] fall within the reach of the offense of attempted criminal threat. For example, if a defendant takes all steps necessary to perpetrate the completed crime of criminal threat by means of a written threat, but the crime is not completed only because the written threat is intercepted before delivery to the threatened person, the defendant properly may be found guilty of attempted criminal threat. Similarly, if a defendant, with the requisite intent, orally makes a sufficient threat directly to the threatened person, but for some reason the threatened person does not understand the threat, an attempted criminal threat also would occur. Further, if a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat. In each of these situations, only a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself." (*Toledo*, *supra*, 26 Cal.4th at p. 231.) The court concluded, "a defendant can be found to have committed the crime of attempted criminal threat only if he or she acts with the specific intent to make the very kind of threat—that is, a threat that 'on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened as to convey a gravity of purpose and immediate prospect of execution'—to which section 422 applies. If a defendant acts with such a purpose, but is thwarted from completing the crime by some fortuity or unanticipated event, imposing criminal liability upon the defendant for attempted criminal threat in no way will undermine the legislative purpose of prohibiting

threats of the specific nature and severity of those identified in section 422." (*Id*. at p. 232.)[6]

The reasoning of *Toledo*, then, teaches that to be guilty of attempted criminal threat, a defendant must have acted with the specific intent to make a sufficient threat that, through a fortuity, did not result in the victim experiencing sustained fear. Defendant here contends that the statements he made to Huang cannot reasonably be interpreted as sufficient threats. To reprise: the officer who was following defendant on September 24 testified that defendant was speaking "very loud" and told Huang, "I know you have a wife and children," that as defendant left the restaurant he said something to the effect that it was not over yet, and that when Huang confronted him outside the restaurant and said, "[Y]ou will not threaten my family," defendant immediately said, "[T]hat's not what I meant." Huang testified that defendant was upset when he refused to have the poster removed, and that defendant said something like "I feel sorry for your family and feel sorry for the restaurant," or that he was "sorry for your business and sorry for the family and kids." Huang returned to his work, then became "a little bit upset" when he had time to think about defendant's statement, so he went outside the restaurant and asked defendant what he had meant. He was not sure whether defendant had threatened the restaurant.

---

[6] In *People v. Jackson* (2009) 178 Cal.App.4th 590, 593 (*Jackson*), the Sixth District Court of Appeal concluded that under *Toledo*, to find a defendant guilty of attempted criminal threat, the jury must find the defendant "specifically intended to make a threat that could '*reasonably* cause the person to be in sustained fear for his or her own safety or for his or her family's safety.' [Citation.]" The question of whether an attempted criminal threat may occur even if it would not be reasonable under the circumstances for the victim to be in sustained fear is currently pending before our Supreme Court. (*People v. Chandler* (2012) 211 Cal.App.4th 114, review granted Feb. 13, 2013, S207542.) Our conclusions here do not depend on the resolution of this issue.

We agree with defendant that, viewed in context, his statements were not " ' "so unequivocal, unconditional, immediate and specific as to convey . . . a gravity of purpose and an immediate prospect of execution of the threat." ' " (*In re George T.*, *supra*, 33 Cal.4th at p. 630.)[7] He mentioned Huang's family only in general terms and made no specific threat. There is no indication that Huang's family was on the premises or of any previous relationship between defendant and Huang that would suggest his statement indicated he would in fact harm Huang's family. When Huang confronted defendant, defendant immediately disavowed any intention to threaten them.

We recognize that there are cases in which words that themselves do not threaten to commit a specific crime resulting in death or great bodily injury may still be sufficient to constitute a criminal threat based on the circumstances, including the parties' history. For instance, in *Mendoza*, *supra*, 59 Cal.App.4th at pp. 1340–1342, the defendant said to a witness, "[Y]ou fucked up my brother's testimony. I'm going to talk to some guys from Happy Town." The defendant was a member of the Happy Town criminal street gang, the victim had recently given damaging testimony against the defendant's brother in a murder case against him, and the defendant's brother was also a member of the gang. In those circumstances, "[a] rational juror could reasonably find a threat to bring a person to the attention of a criminal street gang as someone who has 'ratted' on a fellow gang member presents a serious danger of death or great bodily injury." (*Id.* at p. 1341.) Moreover, the court noted, the defendant acted on his intention: less than half an hour after the defendant made the statement, gang members parked in front of the victim's home and honked to get her attention. (*Ibid.*) Similarly, in *People v. Martinez* (1997) 53

_____

[7] The prosecutor herself recognized that defendant's statements to Huang were not unequivocal. She argued: "I have charged [defendant] with attempted criminal threats. I'm telling you he did not threaten, but he tried to. He tried to intimidate Bailey Huang. There is no other legitimate reason why he would say those words. [¶] The defendant would be right if [*sic*] their argument that I didn't prove that it was unequivocal and I didn't prove that it was specific if I was charging him with criminal threats, but I'm not. I'm charging him with an attempt to do so."

Cal.App.4th 1212, 1218, 1221, the appellate court concluded that although the words, " 'I'm going to get you,' 'I'll get back to you,' 'I'll get you,' " might not in themselves convey a threat to commit a crime resulting in death or great bodily injury, the defendant's actions after the threat—setting fire to a building at the victim's workplace near the time the victim arrived at work—"g[a]ve meaning to the words and impl[ied] that he meant serious business when he made the threat." (Fn. omitted.) In contrast to the facts in *Mendoza* and *People v. Martinez*, there are no circumstances here to bolster and give clear meaning to defendant's words.

An example of statements that do *not* rise to the level of criminal threats is found in *Ricky T.*, *supra*, 87 Cal.App.4th 1132. The minor there became angry at a teacher for accidentally hitting him with a classroom door. He cursed the teacher and said, " 'I'm going to get you.' " The teacher felt physically threatened. (*Id*. at p. 1135. ) The following day, the minor told an officer he did not mean to sound threatening. He acknowledged that his actions were inappropriate and apologized for the incident. (*Ibid*.) The juvenile court found defendant had committed a violation of section 422, and Division Four of the First Appellate District reversed. (*Ibid*.) The court reasoned that there was no immediacy to the threat, and that there were no surrounding circumstances to give meaning to the words. (*Id*. at p. 1138.) The court noted that "[i]f surrounding circumstances within the meaning of section 422 can show whether a terrorist threat was made, absence of circumstances can also show that a terrorist threat was not made within the meaning of section 422." (*Id*. at p. 1139.) It distinguished *People v. Martinez*, *supra*, 53 Cal.App.4th 1212, and *Mendoza, supra,* 59 Cal.App.4th 1333, on the ground that in those cases, the surrounding circumstances, particularly the defendants' actions *after* making the threats, showed that the statements were made with the requisite intent. (*Ricky T., supra,* 87 Cal.App.4th at p. 1139.)

Here, on the other hand, defendant's actions after his statements to Huang show the opposite—when challenged, defendant immediately disclaimed any intent to threaten

24

Huang's family. The ambiguity of his words, combined with the lack of circumstances suggesting he intended to make a true threat, compel us to conclude the evidence does not support a finding that he acted with the requisite specific intent "to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat . . . ." (*Toledo*, *supra*, 26 Cal.4th at pp. 230–231.) Defendant's conviction of making an attempted criminal threat (count one) must therefore be reversed.[8]

## I. Obstructing a Peace Officer

In counts fourteen and sixteen, defendant was convicted of obstructing or delaying Elia in the performance of her duties on September 23 and 24, in violation of section 148, subdivision (a)(1).) These convictions were based on his actions in taking down the flyers.

The elements of this crime are: " ' "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace office engaged in the performance of his or her duties." ' " (*Yount v. City of Sacramento* (2008) 43 Cal.4th 885, 894–895.)[9] Defendant contends these

---

[8] The court in *Toledo* did not decide whether the crime of attempted criminal threat necessarily requires that the defendant actually make a threat that satisfies the provisions of section 422. (*Toledo*, *supra*, 26 Cal.4th at p. 234 & fn. 8.) However, *Toledo* states clearly that to be guilty of attempted criminal threat, a defendant must *specifically intend* to threaten to commit a crime that would result in death or great bodily injury, with the further intent that the threat be taken as a threat. (*Id*. at pp. 230–231.) Our conclusion is based on this holding, not on the issue the *Toledo* court reserved.

[9] Section 148, subdivision (a)(1) provides: "Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

convictions are improper because he did nothing to interfere with the officers when they were engaged in the performance of their duties. The Attorney General concedes this point, acknowledging that "[a] survey of applicable case law shows that the actual presence of an officer is an integral component of the aforementioned elements." We agree, and shall order these convictions reversed.

### III. DISPOSITION

The convictions of counts one (§§ 422 & 664), two (§ 459), nine (§ 666), fourteen and sixteen (§ 148, subd. (a)(1)) are reversed. In all other respects, the judgment is affirmed. The matter is remanded for resentencing.


        _____
        Rivera, J.


We concur:


_____
Ruvolo, P.J.


_____
Humes, J.