Filed 11/18/20  P. v. Berg CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY JOHN BERG,<br><br>          Defendant and Appellant. | A156886<br><br>(Sonoma County<br>Super. Ct. No. SCR711894) |

Jeffrey John Berg was convicted of making criminal threats while personally using a knife, and two counts of exhibiting a deadly weapon.  Berg contends that the criminal threats conviction must be reversed because the trial court error in limiting his counsel's cross-examination as to the credibility of the complaining witness and in giving a special jury instruction that reinforced the credibility of the complaining witness denied him a fair trial.  We agree, and we shall reverse this conviction.  Berg also contends that the trial court erroneously denied his *Trombetta*[1] motion to dismiss the criminal threats charge, or at a minimum give an adverse inference jury instruction, based on the alleged failure of the police to collect exculpatory evidence at the scene.  On this issue we find no error.

---

[1] *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*).

1

## BACKGROUND

**A.** *Charged Offenses*

The Sonoma County District Attorney charged Berg with making criminal threats (Pen. Code,[2] § 422, subd. (a) [count 1]); dissuading a witness (§ 136.1, subd. (b)(1) [count 2]; and with two misdemeanor counts of exhibiting a deadly weapon (§ 417, subd. (a)(1) [counts 3 & 4].) It was further alleged that Berg personally used a knife during the commission of counts 1 and 2 (§ 12022, subd. (b)(1)).

**B.** *Evidence at Trial*

In the late afternoon of January 14, 2018, David Sean Sullivan, a retired New York City police detective, was drinking beer and watching football at the Hideaway Bar in Putnam Plaza in Petaluma. Sullivan had been at the bar for two to three hours and, by his estimate, drank four to six beers. When Sullivan went outside to smoke on a balcony overlooking American Alley in the plaza, he saw Berg cursing and yelling at people. Recognizing Berg from a previous encounter in the plaza about four days earlier—during which Berg screamed obscenities and threw food at Sullivan and at others in the plaza—Sullivan called the police.

Meanwhile, Robyn Williams was working at a bakery across American Alley. Williams heard someone yelling outside, and, when she went to the window, saw Berg walking down the alley. He was yelling obscenities and appeared to be "doing . . . whippets," which she believed was nitrous oxide gas.

---

[2] All further undesignated statutory references are to the Penal Code.

Williams went outside and called the police. She saw Sullivan on the balcony at the Hideaway Bar and yelled up to ask if he was going to call the police. Sullivan confirmed he was also on the phone with the police.

At that point, Berg started to come at Williams with a box cutter. Williams was frightened; she ran back into the bakery and locked the door. Berg tried without success to open the bakery door by bashing it with a chair. Berg then went back into American Alley and yelled at Sullivan, still on the balcony. Sullivan told Berg to calm down and said the police were on the way. Sullivan admitted that he may have told Berg, "[W]hy don't you go fuck yourself now?"

Sullivan testified at trial that Berg reached into a bag, took out a blade and said, " 'I'm going to cut you open. I'm going to fuck you up. I'm going to kill you.' " However, when Sullivan was shown a transcript of what he said to law enforcement at the scene, he admitted on cross-examination that he told police, "I don't remember now if he said kill me because it doesn't matter to me. . . . [¶] You got a blade in your hand and you're rushing up the stairs at me."

Sullivan testified that Berg then ran up the stairs to the balcony. As Berg was part way up the stairs, Sullivan took the lid from a Weber barbeque grill to use as a shield and then hurled the grill at Berg. The grill squarely hit Berg, who was stunned and staggered back down the stairs.

A passerby, Gregory Johnson, testified that as he walked into the plaza that afternoon, Sullivan warned him not to go down American Alley. Johnson started to walk in the other direction but returned when he heard an exchange between Sullivan and Berg. Johnson could not hear everything, but thought he heard Berg yell "faggot" and "come at me bro" to Sullivan. Johnson heard Sullivan say to Berg, "This isn't my first rodeo." Johnson

described Sullivan as "very calm, very friendly," and described Berg as "being aggressive[.]" Johnson saw Berg run up the stairs towards Sullivan. He saw Sullivan use the lid of a barbeque grill as a shield.

A Petaluma police officer who responded to the scene, Dario Giomi, recognized Berg from previous contacts. Giomi searched Berg and found a box cutter in his possession.

Giomi interviewed Sullivan at the scene. Sullivan told Giomi that Berg had made a verbal threat. Giomi immediately noticed that Sullivan had been drinking. Giomi could smell alcohol on Sullivan's breath, but Sullivan did not appear impaired. Giomi knew that Sullivan "had been hanging out in a bar." Because Giomi was aware that alcohol can impact a person's perception and recollection of events, he wanted to give Sullivan a test to determine his blood alcohol level, although he did not tell Sullivan he wanted to administer the test. By the time Giomi retrieved the Breathalyzer machine from his patrol car and returned to the scene, Sullivan was gone.

After getting Sullivan's statement, a woman came up to Giomi while he was still at the scene in Petaluma. The woman said that when she came out of a bathroom, she saw Sullivan talking to Berg, but Berg did not say anything back, and he appeared confused. She then said, "[t]hat's all I have" and walked away, without Giomi obtaining any contact information from her during their 20 to 30 second encounter. Giomi had the impression that the woman had not seen the entire incident.

## C. *Verdict and Sentencing*

The jury acquitted Berg of dissuading a witness (§ 136.1, subd. (b)(1) [count 2]). The jury convicted Berg of making criminal threats (§ 422, subd. (a) [count 1]) and found true the allegation that he personally used a knife

4

(§ 12022., subd. (b)(1)). The jury also convicted Berg of two misdemeanor counts of exhibiting a deadly weapon (§ 417, subd. (a)(1) [counts 3 & 4]).

The trial court imposed the upper term of three years on the criminal threats count (§ 422), and a one-year weapon use enhancement, for an aggregate term of four years. The trial court sentenced Berg to time-served on the two misdemeanor counts of exhibiting a weapon (§ 417, subd. (a)(1)).

This timely appeal followed.

## DISCUSSION

### I. Reversal is Required Based on the Cumulative Effect of the Trial Court's Errors

Berg argues that the trial court improperly limited defense counsel's cross-examination of Sullivan, and that the trial court gave a special jury instruction that bolstered Sullivan's credibility and disparaged defense counsel. He claims the combined effect of these two errors deprived him of a fair trial. We agree.

### A. *The Limits on Defense Counsel's Cross-Examination of Sullivan*

#### 1. *Background*

Berg filed a written motion in limine to admit evidence that Sullivan had a pending misdemeanor case for violating Penal Code section 484, subdivision (a), in which he was "alleged to be a repeated shoplifter of food items from Petaluma Market in Petaluma." At the hearing on the motion, defense counsel made the following offer of proof: "It's an open 484 case from May of this year where Mr. Sullivan was arrested for stealing a sandwich from the Petaluma Market. *There was also evidence that he had sort of an MO of ordering sandwiches and just walking out without paying for them.* And I think it—to me it actually does shed a lot of light on who Mr. Sullivan is, especially if he's going to come up to the stand and talk about his past as a former NYPD officer. He's certainly not the totally clean character that he

5

would like to be portrayed as, and I do think some questioning on this is relevant particularly given how fresh it was to what happened." (Italics added.)

The prosecution did not argue against the admissibility of the pending theft case. But citing Evidence Code section 352, the prosecutor objected to any questioning beyond, "Do you have a currently pending case for theft?" The prosecutor stated that Sullivan had been offered Community Accountability Diversion (CAD)[3] and also expressed concern that Sullivan would incriminate himself.

Defense counsel argued the underlying facts of the thefts were relevant to Sullivan's credibility. Counsel wanted to ask Sullivan "a little bit about . . . his dishonest scheme in more detail." The trial court noted that because Sullivan's case was pending he could invoke his right not to answer questions about a dishonest scheme.[4] The trial court took the issue under submission until the following court date.[5]

Defense counsel stated he would assume "[f]or the moment" he could only ask the basic question of whether Sullivan had a current pending case for theft.

---

[3] The record provides no information about this diversion program or its requirements, other than statements by counsel and the court. No one testified in front of the jury about Sullivan's participation in CAD. In fact, as the Attorney General notes, "[t]he name and nature of the diversion program were beside the point. They were not facts in the case."

[4] This did not materialize and is not an issue on appeal.

[5] The record does not reflect that any ruling was ever made in advance of Sullivan's testimony.

Five days later, at trial, Sullivan testified on direct examination that he had a current misdemeanor theft case pending in Sonoma County, and that he was not receiving any benefit in exchange for testifying at Berg's trial.

During cross-examination, defense counsel asked Sullivan about his "currently open theft case . . . in Sonoma County." Sullivan acknowledged he had been "charged with stealing from Petaluma Market." Defense counsel then asked Sullivan whether the allegation was that he had stolen from Petaluma Market "12 times in the past." The trial court sustained the prosecutor's objection and told Sullivan he did not need to answer the question. On the prosecution's motion, the trial court ordered the question stricken from the record.

Defense counsel then asked Sullivan, "You're getting a deal in that case where you're getting the case dismissed, right?" Again, the trial court sustained the prosecutor's objection. Then, defense counsel asked Sullivan, "How many thefts have you committed in your life and gotten away with?" and "[Y]ou did steal a $7 sandwich from Petaluma Market[,] right?" Both of these questions drew objections from the prosecutor, which were sustained.

The court called counsel into chambers and stated: "He's been impeached with a prior theft conviction. You keep going to 12 thefts. You've implied erroneously to the jury something that is clearly diversion eligible to the entire state of California, and anymore misrepresentations to the jury based on your cross-examination is not going to be tolerated, and I'm not going to come into chambers. It's going to be all on the record in front of the jury."

Defense counsel responded: "I certainly don't mean to disrespect the Court by any stretch. And what I'm referring to in terms of 12 thefts, I won't go into it if the Court is telling me that's it. If that's it. I won't ask any more

7

questions.  [¶] I don't believe that I'm misrepresenting what I was informed of in the police report[6] for that theft case for Mr. Sullivan.  That's information contained in that report that was given to me by the district attorney's office.  I'm asking that in good faith."  The trial court, however, barred any further inquiry: "So the fact that there's a theft, quite frankly, it's questionable even admitting that into evidence where it's a diversion case, it's already in the record.  It's already been asked and answered by [the prosecutor].  Anything else concerning that is not relevant."

2.    *Analysis*

Under both the California and Federal constitutions, a defendant's right to confront the witnesses against him encompasses a right to impeach those witnesses.  (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15; *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678; *Davis v. Alaska* (1974) 415 U.S. 308, 316; *People v. Quartermain* (1997) 16 Cal.4th 600, 623.)  But not every restriction on a defendant's desired method of cross-examination is a constitutional violation.  (*People v. Chatman* (2006) 38 Cal.4th 344, 372.)  The trial court "retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 946, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390; *People v. King* (2010) 183 Cal.App.4th 1281, 1316.)  And, absent a showing by defendant that the prohibited cross-examination would have produced "a significantly different impression of [the witness's] credibility." (*Delaware v. Van Arsdall, supra,* 475 U.S. at p. 680), there is no confrontation clause violation.  (*People v. Frye, supra,* 18 Cal.4th at p. 946.)

---

[6] The underlying police report is not included in the record.  However, the veracity of the report was not challenged in the trial court or on appeal.

Under California law, evidence of nonfelony conduct involving moral turpitude is generally admissible to impeach a witness's credibility as it may suggest a willingness to lie. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295-296.) This is true even if the witness has charges pending or the conduct did not result in a conviction. (*People v. Martinez* (2002) 103 Cal.App.4th 1071, 1080 ["It is longstanding law that a prosecution witness can be impeached by the mere fact of pending charges"].) "[T]he test for admissibility of evidence is not a strict one: As a general matter, evidence may be admitted if relevant (Evid. Code, § 350), and ' "[r]elevant evidence" means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action' (*id., § 210*)." (*Coffey v. Shiomoto* (2015) 60 Cal.4th 1198, 1213.) " ' "The test of relevance is whether the evidence tends, 'logically, naturally, and by reasonable inference' to establish material facts . . . ." ' " (*People v. Wilson* (2006) 38 Cal.4th 1237, 1245.) However, even relevant evidence may be excluded if its "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

The trial court has broad discretion to determine the relevance of evidence, and a reviewing court will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner. (*People v. Jones* (2013) 57 Cal.4th 899, 947.)

Here, the trial court precluded defense counsel from exploring the full extent of Sullivan's misdemeanor misconduct on the ground that it was not relevant. The jury was permitted to hear that he had stolen a sandwich once from the Petaluma Market, but not that he had done so a dozen times.

But if one time was relevant and admissible to the issue of the witness's credibility, 12 times was plainly relevant, too, in assessing whether Sullivan had a "willingness to lie" (*People v. Wheeler, supra,* 4 Cal.4th at p. 295), at the time he reported the crime and when he testified at trial. (See *People v. Gutierrez* (2018) 28 Cal.App.5th 85, 91 [" '[E]vidence that a defendant committed a series of crimes is more probative of his credibility than a "single lapse" ' "].) Sullivan's credibility was a pivotal issue in the criminal threats charge, since he was the only witness who heard Berg yell that he was going to kill Sullivan. The prosecution presented Sullivan as an experienced New York City police detective and a concerned citizen who had had a one-time lapse in judgment. Had the jury heard evidence that Sullivan had been involved with 12 thefts from the same market, they could very well have had "a significantly different impression of [Sullivan's] credibility." (*Delaware v. Van Arsdall, supra*, 475 U.S. at p. 680.)

Relying on Evidence Code section 352, the Attorney General argues the evidence was properly excluded because its probative value was minimal; the alleged thefts had no bearing on whether Sullivan could perceive what had occurred. The trial court, however, never appeared to engage in an Evidence Code section 352 analysis. The proffered evidence had significant probative value as it was offered to impeach Sullivan's overall credibility and to establish his willingness to commit acts of dishonesty. The evidence was not so complex that it would have entailed an undue consumption of time or, as the Attorney General now suggests, resulted in "12 trials within[7] the main

---

[7] The Attorney General contends the "details" of the offenses "could have been time consuming and distracting without yielding relevant information." But this is speculation because the objection was never raised, and the issue did not figure into the court's analysis.

trial," an argument not raised below. Nor was the evidence remote in time, given that the theft case was apparently pending, or confusing.

Finally, any danger that the jury would use the evidence of 12 thefts for an improper purpose was already taken into account by CALCRIM No. 316[8] given to the jury on how to evaluate the credibility of witnesses who "may have committed a crime or other misconduct . . . ." Sullivan was the only witness to whom this instruction was applicable.

We thus conclude that it was error to restrict the cross-examination of Sullivan as it severely limited defense counsel's ability to impeach the credibility of this key witness.

The next issue is what, if any, is the consequence. The constitutionality of an improper denial of a defendant's opportunity to cross-examine an adverse witness on matters reflecting on the witness's credibility is subject to the harmless error standard set forth in *Chapman v. California* (1967) 386 U.S. 18. (See *Delaware v. Van Arsdall, supra,* 475 U.S. at p. 684.) Under the *Chapman* harmless-error standard of review, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness'

---

[8] As given, CALCRIM No. 316 instructed: "If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."

11

testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. [Citations.]" (*Delaware v. Van Arsdall* at p. 684.)

We address the prejudicial effect of the trial court's improper limitation on cross-examination in part I.C., *post*.

## B. *The Special Instruction About Sullivan*

### 1. *Background*

Towards the end of the prosecution's case, at a conference outside the presence of the jury, the prosecutor offered to call Sullivan's attorney to testify that Sullivan was not receiving a deal in exchange for his testimony. The court declined the request but said the prosecutor could draft a special instruction to that effect and that Sullivan was "participating in diversion."

Over defense counsel's objection to the instruction as written, the court stated that without the special instruction the jury would have the impression that Sullivan was receiving a dismissal for cooperating with law enforcement. Defense counsel correctly noted that the prosecution had already asked Sullivan if he was getting a deal for testifying.[9] Defense counsel also explained why he had a good faith belief that Sullivan had 12 pending cases (an uncontroverted police report) and why he believed that

---

[9] The prosecutor asked four questions about Sullivan's conduct. Sullivan answered yes to the first two questions: "Mr. Sullivan, at the time you—you lived in Petaluma?" and "And do you currently have a—a pending theft case with my office?" The next question was: "And are you receiving any sort of benefit in that case for testifying here today?" The witness said no, and the prosecutor followed up, "Is that a misdemeanor?" To which the response was "[y]es."

12

Sullivan would not necessarily have qualified for diversion. Defense counsel said that "[s]ometimes people get CAD who aren't eligible for CAD," adding that Sullivan had been offered CAD in May, and then "rereferred" to CAD in both August and October while Sullivan's case was pending. Defense counsel represented that "rereferrals" to CAD are not necessarily a matter of right and that it was possible Sullivan received a benefit beyond basic diversion. Accordingly, defense counsel averred that he had asked what he thought was an accurate follow-up question on cross-examination.

The court gave this special instruction:

"During cross examination of witness Sean Sullivan, you may have heard defense counsel suggest that Mr. Sullivan received some type of benefit from the District Attorney's Office in a pending misdemeanor case. Defense counsel suggested that Mr. Sullivan will receive a dismissal of his petty theft case in exchange for his testimony. This is inaccurate. You are not to consider those questions for any reason. You are reminded that questions from either attorney are not evidence. And nothing inferred from those questions are to be considered as actual evidence in this case.

"You are further instructed as follows:

"1. In Mr. Sullivan's pending case, he is eligible for Community Accountability Diversion (CAD).

"2. First time offenders charged with specific misdemeanors, including Petty Theft, are eligible by law to participate in this diversion program.

"3. Upon successful completion of the CAD program the misdemeanor charges are dismissed by law.

13

"4.     Participation in the CAD program was in no way a benefit provided to Mr. Sullivan in exchange for his testimony in this case, rather it was an opportunity provided to him by right."

2.     *Analysis*

Berg argues this instruction unfairly penalized him with an adverse inference for defense counsel's conduct.  He analogizes the instruction given here to that criticized in *People v. Bell* (2004) 118 Cal.App.4th 249, 257.  *Bell* involved untimely discovery provided by defense counsel, but the instruction referred to "the Defendant" who was not responsible for the late discovery. (*Id.* at pp. 254-255.)  Here, the instruction did not assign blame to Berg, but specifically referred to defense counsel's "inaccurate" suggestion that Sullivan had received some type of benefit in exchange for his testimony.  The instruction could not be reasonably interpreted to cast aspersions on Berg himself.

Berg also contends the instruction violated his rights to due process and assistance of counsel because it was duplicative and argumentative and bolstered Sullivan's credibility and disparaged defense counsel.

"A jury instruction is improperly argumentative if 'it would invite the jury to draw inferences favorable to the defendant [(or the prosecution)] from specified items of evidence on a disputed question of fact, and therefore properly belongs not in instructions, but in the arguments of counsel to the jury.' [Citations.]  'In a proper instruction, "[what] is pinpointed is not specific evidence as such, but the *theory* of the defendant's [(or the prosecution's)] case." ' [Citation.]  We review an argumentative instruction for harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836."  (*People v. Santana* (2013) 56 Cal.4th 999, 1012.)

14

*People v. Wright* (1988) 45 Cal.3d 1126 is instructive. In *Wright*, the California Supreme Court considered whether the trial court erred by failing to give pinpoint instructions requested by the defense about eyewitness identifications. (*Id.* at pp. 1134-1144.) The court disapproved as "argumentative" an instruction that would have advised the jury to " 'consider' " various items of evidence, such as the fact that all the robbers wore ski masks, in assessing the defendant's guilt. (*Id.* at pp. 1135, 1138.) The *Wright* court explained: "We disapproved of 'the common practice [of] [selecting] certain material facts, or those which are deemed to be material, and endeavoring to force the court to indicate an opinion favorable to the defendant as to the effect of such facts, by incorporating them into instructions containing a correct principle of law,' and we explained, 'An instruction should contain a principle of law applicable to the case, expressed in plain language, indicating no opinion of the court as to any fact in issue.' " (*Id.* at p. 1135, quoting *People v. McNamara* (1892) 94 Cal. 509, 513.)

Turning to the case before us, we note that during defense counsel's challenged line of questioning, the trial court sustained three objections. The jury also had been instructed with CALCRIM No. 222, which emphatically tells jurors that "[n]othing" that attorneys say, including their questions and argument, is evidence, and that they must not assume that something is true "just because" an attorney "asked a question that suggested it was true."

The Attorney General appears to concede that the instruction was duplicative, but maintains it was necessary because "there was a risk that the point needed emphasis beyond the standard instruction." The problem is that the instruction singled out defense counsel and implied that he had acted improperly by suggesting "inaccurate" information about Sullivan's pending case. The Attorney General counters that the challenged instruction

15

was not argumentative because it did not direct the jury to specific evidence. Rather, it directed the jury to what was not evidence. In this regard, the Attorney General claims the instruction was more in the nature of an admonition that told the jury what they should not consider. Viewed under this rubric, the Attorney General asserts the instruction could not be deemed argumentative. We disagree.

*People v. Peoples* (2016) 62 Cal.4th 718 (*Peoples*) cited by the Attorney General is distinguishable. In *Peoples*, the California Supreme Court explained that although an admonition singled out defense counsel for referring to stricken testimony in his questioning of an expert it was appropriate under the circumstances because the question referred to facts not in the record. (*Id.* at pp. 766-767.) There, defense counsel attempted to ask an expert about her willingness to testify in the absence of data. (*Id.* at p. 767.) The court allowed defense counsel to ask that question, but sought, upon the prosecutor's motion, to clarify that the reason the expert lacked sufficient evidence was that defense counsel failed to comply with a discovery order. (*Ibid.*) "The force of the trial court's admonition was to correct a possible misperception on the part of the jury that [the expert] had engaged in an impropriety in her prior testimony, and to prevent defense counsel from taking advantage of a situation he had created during the earlier proceedings." (*Ibid.*) Notably, the admonition did not instruct the jury to alter the weight assigned to the evidence presented. (*Ibid.*)

Here, defense counsel was not permitted to ask Sullivan about the nature of his pending theft offenses. The challenged instruction reinforced the notion that Sullivan was a "first-time offender," which the prosecutor then exploited during closing argument by referring to Sullivan as a "first-time offender" who had an "open theft case." The net effect of the instruction

16

was to convey the court's negative opinion about defense counsel and to invite the jury to draw favorable inferences to the prosecution's complaining witness.

We address the prejudicial effect of the argumentative instruction in part I.C., *post.*

## C.     *Cumulative Effect of the Errors Requires Reversal*

"The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' [Citation.]" (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) "Under the 'cumulative error' doctrine, we reverse the judgment if there is a 'reasonable possibility' that the jury would have reached a result more favorable to the defendant absent a combination of errors." (*People v. Jandres* (2014) 226 Cal.App.4th 340, 361; see *People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

The criminal threats charge hinged on the testimony and the credibility of Sullivan. A necessary element of this charge is a verbal statement. (§ 422, subd. (a); *People v. Toledo* (2001) 26 Cal.4th 221, 227-228 [necessary elements include verbal statement].) No other witness corroborated Sullivan's testimony at trial that Berg verbally threatened to kill him. It was thus central to the prosecution's case. (*Delaware v. Van Arsdall, supra,* 475 U.S. at p. 684.) Further, conflicting evidence was presented on this essential element. A year after the incident, Sullivan was clear in his trial testimony that Berg had threatened to kill him. Yet, at the scene, Sullivan was equivocal in his account of the incident. Sullivan admitted on cross-examination that he told Giomi right after the incident, "I don't remember now if he said kill me because it doesn't matter to me. . . . [¶] You got a blade in your hand and you're rushing up the stairs at me." Also, Giomi testified at

17

trial about the unidentified witness who said Sullivan did the talking, and that Berg said nothing.

This limitation on cross-examination, combined with the special jury instruction, left the jury with the impression that Sullivan, a former police officer, was a first-time offender who had experienced a single lapse of judgment when he stole a sandwich from Petaluma Market. Taking one sandwich might be chalked up to carelessness or mistake. However, taking a dozen sandwiches from the same market (the "M.O." defense counsel referred to in arguing to admit the evidence) is altogether different in the jury's consideration of credibility.

The Attorney General contends that Berg was not prejudiced by the limits put on the cross-examination of Sullivan because "the jury had adequate information to evaluate the credibility" of Sullivan: his pending theft case, his consumption of six beers, his acknowledgment that he could have been wrong about Berg's exact words and whether Berg said he would kill him, and the unidentified witness who saw part of the incident and reported that only Sullivan had been talking.

All of this evidence establishes that the criminal threats charge was a close case. And yet, even though it was not disputed that Sullivan engaged in misconduct involving more than one $7 sandwich on one day at the Petaluma Market, the jury was not permitted to consider this fact, and then was led to believe, by the limitation on testimony and the special jury instruction, that Sullivan was a credible witness. This was not the complete picture.

The special instruction was argumentative and misleading and the defense was effectively precluded from impeaching Sullivan on the critical issue of his credibility. Taken together, these errors infringed Berg's fair trial rights to an unacceptable degree; we cannot conclude their combined effect

18

was harmless.  There is a reasonable possibility at least one juror would have had a reasonable doubt on the criminal threats charge in the absence of both errors.  (*Buck v. Davis* (2017) 137 S.Ct. 759, 776; *Cone v. Bell* (2009) 556 U.S. 449, 452.)

## II.    The Trial Court's Denial of the *Trombetta/Youngblood*[10] *Motion* is Supported by Substantial Evidence

Berg argues the trial court erred in denying his motion to dismiss the criminal threats count because police failure to collect exculpatory evidence violated his due process rights under *Trombetta* and *Youngblood*.  He further asserts the trial court had a sua sponte duty to give an adverse inference jury instruction, which it did not.

### A.    *Background*

Prior to trial, Berg moved to dismiss the criminal threats charge pursuant to *Trombetta* and *Youngblood*, alleging police failed to obtain contact information from a witness who approached Giomi at the scene.

The trial court conducted an evidentiary hearing at which Giomi testified that he failed to obtain the contact information of the woman who said she had heard Sullivan talking to Berg.  Giomi believed the woman had only heard a small portion of the incident.

The court denied the motion to dismiss, finding there was no failure to preserve evidence.  The court noted the evidence was "never deleted" because it had "never [been] received by law enforcement so, . . . it's really an investigation issue."

### B.    *Analysis*

"The federal constitutional guarantee of due process imposes a duty on the state to preserve 'evidence that might be expected to play a significant

---

[10] *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*).

19

role in the suspect's defense.' " (*People v. Montes* (2014) 58 Cal.4th 809, 837 (*Montes*).) Whether the loss of evidence rises to the level of a due process violation is governed by the principles set forth by the United States Supreme Court in *Trombetta* and *Youngblood.* (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 771 (*Alvarez*).) Under *Trombetta*, law enforcement agencies must preserve evidence only if the evidence possesses exculpatory value that was apparent before it was destroyed and if the evidence is of a type not obtainable by other reasonably available means. (*People v. Velasco* (2011) 194 Cal.App.4th 1258, 1262 (*Velasco*); *Trombetta, supra,* 467 U.S. at pp. 488-489.) As an alternative to establishing the apparent exculpatory value of the lost evidence, *Youngblood* provides that a defendant may show that " 'potentially useful' " evidence was destroyed as a result of bad faith. (*Velasco, supra,* at p. 1262; see *Youngblood, supra,* 488 U.S. at p. 58.)

Although law enforcement has a duty to preserve exculpatory or potentially exculpatory evidence in its possession, "due process does not require the police to collect particular items of evidence. [Citation.] 'The police cannot be expected to "gather up everything which might eventually prove useful to the defense." ' [Citation.]" (*Montes, supra,* 58 Cal.4th at p. 837 [no duty to collect blood samples]; *Velasco, supra,* 194 Cal.App.4th at p. 1263 [no duty to preserve prison clothing modified to conceal weapon]; *People v. Mills* (1985) 164 Cal.App.3d 652, 656 [no duty to collect breath samples]; *People v. Kelley* (1984) 158 Cal.App.3d 1085, 1101-1102 [no duty to tape-record confession]; see also *People v. Harris* (1985) 165 Cal.App.3d 324, 329 ["To date there is no authority for the proposition that sanctions should be imposed for a failure to *gather* evidence as opposed to a failure to preserve evidence"]; *People v. Bradley* (1984) 159 Cal.App.3d 399, 406 ["[W]e have found no cases of precedential value which squarely hold that the

prosecution's duty to preserve material evidence encompasses an initial duty to affirmatively collect or gather or seize potentially material evidence in the course of an investigation for defendant's use"].)

"It is axiomatic that the constitutional due process guaranty is a bulwark against improper state action. '[T]he core purpose of procedural due process [is] ensuring that a citizen's reasonable reliance is not frustrated by arbitrary government action.' [Citation.] If the state took no action, due process is not a consideration, because there is no loss of evidence attributable to the Government." (*Velasco, supra*, 194 Cal.App.4th at p. 1263.) Here, a witness came up to the investigating officer at the scene, but the officer took no action to obtain her contact information. Thus, at the outset, this case appears to involve a failure to collect evidence rather than a failure to preserve evidence already within the possession of the police, and the due process considerations presented in *Trombetta* and *Youngblood* are not applicable. (*Id.* at p. 1263.)

Nevertheless, we are mindful that the California Supreme Court and United States Court of Appeals, Ninth Circuit, have at times suggested that there may be an appropriate case where the failure to collect evidence might warrant due process considerations. (*Montes, supra*, 58 Cal.4th at p. 838 ["we have suggested that cases may arise in which the failure to collect evidence could justify sanctions against the prosecution at trial"]; *Miller v. Vasquez* (1989) 868 F.2d 1116, 1119 [sanctions for bad faith failure to collect evidence].) While nothing in the record suggests that this is such a case, even assuming the duty to preserve evidence extends to the officer's failure to obtain a witness's contact information, we find no error.

"We review the trial court's decision on a *Trombetta/Youngblood* motion under the substantial evidence standard." (*Alvarez, supra*, 229 Cal.App.4th

at p. 774; see *People v. Carter* (2005) 36 Cal.4th 1215, 1246.) Our task " 'is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value' in support of the court's decision." (*Alvarez*, *supra*, at p. 774.)

Here, substantial evidence supports the trial court's ruling. At the time the woman spoke to Giomi, it was not apparent she possessed exculpatory evidence. From the officer's perspective, the woman witnessed only a small part of the incident, during which Berg was not talking. Giomi had no reason to believe that the woman's account was inconsistent with Sullivan's version. Sullivan never denied speaking to Berg. Numerous witnesses heard Berg yelling in the alley. Thus, Giomi had no reason to conclude that the woman's statement, and thus her identity, had any evidentiary value.

Further, given the speculative value of obtaining the woman's contact information, Berg was required to show bad faith on part of the officer. (*Youngblood, supra,* 488 U.S. at p. 58.) He did not do so. Giomi's failure to get the woman's name, while although not ideal, is not enough to suggest he acted in bad faith.

Because substantial evidence supports the trial court's determination that the investigating officer did not act in bad faith and that the uncollected evidence did not have apparent exculpatory value, Berg has not shown a violation of his due process rights under *Trombetta* or *Youngblood.*

Finally, Berg contends that, at a minimum, the court should have given a favorable jury instruction under *People v. Zamora* (1980) 28 Cal.3d 88, 103 (jury instruction regarding the "approximate equivalent of the destroyed" evidence). Although an adverse instruction may be a proper response to a due process violation (see *id.* at pp. 96, 167), there was no such violation in

this case.  When there is no *Trombetta/Youngblood* violation, "[t]he trial court [is] not required to impose *any* sanction, including jury instructions. [Citations.]"  (*People v. Cooper* (1991) 53 Cal.3d 771, 811; see also *People v. Medina* (1990) 51 Cal.3d 870, 893-894 [finding no sua sponte duty to give an adverse instruction].)

### III.  Fines and Fees

Because we reverse the criminal threats conviction, Berg must be resentenced.  (See, e.g., *People v. Leon* (2008) 161 Cal.App.4th 149, 170.)  This outcome eliminates the need to address Berg's argument that his attorney was ineffective for failing to request a hearing on ability to pay various fees and a restitution fine under *People v. Dueñas* (2019) 30 Cal.App.5th 1157.  On remand, Berg is free to make the arguments that he believes his attorney should have made with respect to the fines and fees imposed with respect to the two remaining misdemeanor convictions.  (See *People v. Hill* (1986) 185 Cal.App.3d 831, 834 ["When a case is remanded for resentencing by an appellate court, the trial court is entitled to consider the entire sentencing scheme"].)

### DISPOSITION

The judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion.

_____

Miller, J.

WE CONCUR:

_____

Kline, P.J.

_____

Stewart, J.

A156886, *People v. Berg*